# United States Court of Appeals
# for the Federal Circuit

---

**LEE'S FORD DOCK, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2016-2308

---

Appeal from the Armed Services Board of Contract Appeals in No. 59041, Administrative Judge Craig S. Clarke.

---

Decided: August 2, 2017

---

ALAN IRVING SALTMAN, Smith, Currie & Hancock LLP, Washington, DC, argued for appellant.

BARBARA E. THOMAS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee. Represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR., JEFFREY A. REGNER.

ELIZABETH GRAHAM WEBER, Dressman Benzinger LaVelle PSC, Crestview Hills, KY, for amici curiae Kentucky Marina Association, Tennessee Marina Association.

Also represented by KEVIN FITZPATRICK HOSKINS, Cincinnati, OH.

_____

Before TARANTO, SCHALL, and STOLL, *Circuit Judges.*

SCHALL, *Circuit Judge.*

This case comes to us from the Armed Services Board of Contract Appeals ("Board"). Lee's Ford Dock, Inc. ("LFD") appeals the decision of the Board granting summary judgment in favor of the Secretary of the Army and denying LFD's claims for contract reformation and breach of contract. *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 16-1 BCA ¶ 36,298 ("*LFD II*"). The contract at issue is LFD's lease agreement with the U.S. Army Corps of Engineers ("Corps"). For the reasons set forth below, we affirm-in-part and dismiss-in-part.

BACKGROUND

I.

LFD operates a marina at Lake Cumberland, Kentucky on land leased from the Corps. LFD entered into the lease on August 29, 2000 under Lease No. DACW62-1-00-0105 (the "Lease"). *LFD II*, 16-1 BCA ¶ 36,298, at *2 (citing J.A. 237). The Lease superseded prior leases between LFD and the Corps dating back to 1971. The lease area, referred to as the "premises" throughout the Lease, comprises approximately 166 acres (130 acres of water and 36 acres of land). *Id.* The Lease runs for a 25-year term, effective from September 1, 2000 to August 31, 2025. *Id.* On October 7, 2003, the Corps and LFD executed a first supplemental agreement (the "Supplemental Agreement"). The Supplemental Agreement gives LFD the option to extend the Lease for another 25 years to 2050 when it expires in 2025. *See* J.A. 271–72.

One particular provision of the Lease is pertinent to this appeal. Condition 9, "RIGHT TO ENTER AND FLOOD," states:

> The right is reserved to the United States, its officer[s], agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with Government purposes; to make inspections; to remove timber or other material, except property of the Lessee; to flood the premises; to manipulate the level of the lake or pool in any manner whatsoever; and/or to make any other use of the lands as may be necessary in connection with project purposes, and the Lessee shall have no claim for damages on account thereof against the United States or any officer, agent, or employee thereof.

J.A. 241–42.

## II.

Lake Cumberland was impounded from the Cumberland River when the Corps constructed Wolf Creek Dam in 1951. The Wolf Creek Dam-Lake Cumberland project is managed by the Corps. On January 19, 2007, Brigadier General ("BG") Bruce Berwick, Commander of the Corps' Great Lakes and Ohio River Division, and Lieutenant Colonel ("LTC") Steven Roemhildt, Commander of the Corps' Nashville District, signed a Memorandum for Record titled "Wolf Creek Dam Interim Risk Reduction Measures" (the "IRR Memo"). *LFD II*, 16-1 BCA ¶ 36,298, at *3. The IRR Memo documented the decision by BG Berwick and LTC Roemhildt to "lower the pool [of Lake Cumberland] to elevation 680 immediately and hold that elevation for an indefinite period, unless and until the Corps determines that a different pool elevation is more appropriate." *Id.* at *4 (citing J.A. 74). The IRR Memo's Executive Summary stated: "I consider Wolf Creek Dam to be in a high risk of dam failure and therefore I am

taking necessary emergency measures to reduce imminent risk of human life, health, property, and severe economic loss." *Id.* (citing J.A. 67). The IRR cited four reviews, conducted in 2005 and 2006, documenting the condition of Wolf Creek Dam. Three of the reviews concluded that the dam was at a high risk of failure. *Id.*

On January 22, 2007, in accordance with the IRR Memo, the Corps began lowering the water level in Lake Cumberland. *Id.* When the drawdown was completed, the level of the lake was reduced to an elevation of 680 feet. J.A. 81. The lake was maintained at that level while restorative construction was undertaken to repair Wolf Creek Dam. The Corps returned the lake to its previous levels in 2014 after the restoration work was completed.

## III.

Condition 32 of the Lease is titled "DISPUTES CLAUSE." J.A. 250. It provides, in subsection a., that, "[e]xcept as provided in the Contract Disputes Act . . . , all disputes arising under or relating to this lease shall be resolved under this clause and the provisions of the Act."[1] *Id.* The DISPUTES CLAUSE further provides, in subsection c., that "[a] claim by the Lessee shall be made in writing and submitted to the District Engineer for a decision." Finally, subsection c.(2) of the DISPUTES CLAUSE requires that all claims in excess of $100,000 be certified. *Id.*

On January 18, 2013, LFD submitted a certified claim to the District Engineer, who was acting as the contracting officer for the Lease. In its claim, LFD asserted that,

---

[1] The Lease cites to the Contract Disputes Act ("CDA" or "Act") as set forth at 41 U.S.C. §§ 601–613. J.A. 250. The CDA is now codified at 41 U.S.C. §§ 7101–7109. All references and citations to the CDA herein refer to the current version of the Act.

at the time they entered into the Lease, the parties "could not have envisioned" that Lake Cumberland "would be drawn down to such an extreme degree for such a long period of time, as the Lake has only been lowered to 680' once in its more than fifty year history." J.A. 63. LFD continued that, "[a]gainst this background, the purpose of the Lease contract has been frustrated to such an extent that . . . the Lease should be reformed in a manner that requires the Corps to compensate [LFD] for the damages it has incurred as a result of the long-term drawdown of the Lake." *Id.* LFD stated that these damages amounted to at least $4,000,000. J.A. 65. In a final decision dated August 26, 2013, the District Engineer denied LFD's claim. The District Engineer informed LFD that it had the option of appealing the final decision to the Board or to the U.S. Court of Federal Claims. J.A. 176.

On November 27, 2013, LFD timely appealed the District Engineer's final decision to the Board. J.A. 83. In its one-count complaint, LFD alleged that the Corps had breached its contract with LFD by failing to disclose to it superior knowledge on the Corps' part. *See* J.A. 87–88. According to LFD, the Corps conducted major inspections of Wolf Creek Dam in 1994 and 1999, and in 1999 inspectors identified expanding leaks in the dam and called for a crack survey. J.A. 86 ¶ 14. LFD asserted that, prior to entering into the Lease, the Corps failed to disclose this information to LFD, and also failed to disclose to LFD concerns it had about the condition of the dam. *Id.* ¶ 15.

On February 5, 2014, the Corps filed a motion to dismiss LFD's complaint. The Corps argued that the Board lacked jurisdiction under the CDA because LFD had failed to submit its superior knowledge claim to the District Engineer and had failed to certify the claim. *See* J.A. 90–91.

On July 23, 2014, the Board issued a decision addressing the Corps' motion to dismiss. *Lee's Ford Dock*, ASBCA

No. 59041, 14-1 BCA ¶ 35,679 ("*LFD I*"). After stating that it had jurisdiction to entertain LFD's appeal under both the Lease's DISPUTES CLAUSE and the CDA, *id.* at *1, the Board turned to the substance of the Corps' motion. The Board held that the superior knowledge claim was a new claim that had not been certified to the District Engineer for a decision because there was nothing in the operative facts of LFD's certified claim that supported a superior knowledge theory. *Id.* at *10–11. The Board found that the only allegation related to knowledge at the time of the award was the allegation that the parties could not have envisioned that Lake Cumberland would be drawn down to such an extreme degree for such a long time. *Id.* In that regard, the Board stated:

> [LFD's] assertion that the parties could not have envisioned at the time they entered into the Lease that the lake would be drawn down to such an extreme degree for such a long period of time communicates a common understanding that is inconsistent with the disparity of knowledge required for superior knowledge.

*Id.* Of "critical importance," the Board continued, was "the complete absence [in LFD's claim submission] of any assertion that the [Corps] had information that appellant did not." *Id.* The Board concluded that, because the complaint constituted a new claim that had not been presented to a contracting officer for a decision as required by the CDA, it lacked jurisdiction. It therefore struck the complaint. *Id.* at *11. The Board did so, however, without prejudice to the filing of a proper claim with the District Engineer (noting, though, that it expressed no view on the timeliness of any such claim). Lastly, the Board stated that it was retaining jurisdiction over the appeal, and it added that "[LFD] may amend its complaint to assert theories supported by the operative facts stated in the claim." *Id.*

Instead of returning to the District Engineer for a new contracting officer's decision, on January 26, 2015, LFD filed an amended complaint before the Board. The complaint included three counts. In Counts I and II of the amended complaint, LFD sought contract reformation. J.A. 111–16. In Count III, it alleged common law breach of contract. J.A. 116–17.

In Count I, LFD asserted that reformation should be granted for three reasons: *first*, because the Lease did not mention the poor condition of the dam; *second*, because of the exculpatory language of Condition 9 ("RIGHT TO ENTER AND FLOOD")[2]; and *third*, because of the failure of the Corps to take corrective action upon the return of leaking and seepage in the dam. J.A. 111–14. Count II urged reformation on the grounds that (1) when LFD entered into the Lease, it had relied on the dam's functioning so that there would be no need for a long-term drawdown; (2) the Corps had made a commitment to minimize the impact of the drawdown on "Cumberland stakeholders"; and (3) LFD had relied on the representations of Corps officials as to when the lake level would return to normal, representations which proved to be inaccurate. J.A. 114–16. In Count III, LFD alleged that, although the Lease gave the Corps the right to lower the level of the lake, a seven-year drawdown was unreasonably long and therefore amounted to a breach of contract. J.A. 116–17.

In due course, the Corps moved for summary judgment, arguing that there was no genuine issue of material fact on the issues of reformation and breach of contract

---

[2]  According to LFD, reformation was required in part to remedy Condition 9's purportedly giving the Corps "the power to lower the level of Lake Cumberland for unlimited durations without having to compensate [LFD] in any way." J.A. 114.

and that it was entitled to judgment as a matter of law. J.A. 119. On March 7, 2016, the Board granted the Corps' motion. *LFD II*, 16-1 BCA ¶ 36,298, at *14. Addressing Count I of the amended complaint, the Board concluded that that there was no genuine issue of material fact suggesting that the Corps had, through silence in August of 2000, misrepresented to LFD the condition of the dam. The Board also concluded that there was no genuine issue of material fact suggesting that, during contract formation, LFD had made the condition of the dam an issue. In addition, the Board found that there was no evidence that the Corps agreed or would have agreed to an agreement "where it assumed the risk if the dam needed repair necessitating lowering of the water in the lake for a substantial period of time." *Id.* at *11. As far as Count II was concerned, the Board determined that LFD had failed to establish that the Corps had a duty to take the corrective action LFD alleged. *Id.* at *11–12. The Board thus rejected LFD's reformation claims. Turning to Count III of the amended complaint, the Board determined that there was no genuine issue of material fact suggesting a breach of contract. *Id.* at *12–13. The Board also determined that the plain language of Condition 9 gives the Corps the right to lower the water level of the lake, without any limitation on the length of the drawdown. *Id.* The Board therefore rejected LFD's breach of contract claim. *Id.*

## DISCUSSION

LFD has timely appealed to us, arguing that the Board erred in granting the Corps' motion for summary judgment. Before turning to the merits, however, we must address the government's contention that we lack jurisdiction over this appeal.

## I.

Under 28 U.S.C. § 1295(a)(10), we possess exclusive jurisdiction "of an appeal from a final decision of an

agency board of contract appeals pursuant to section 7107(a)(1) of title 41." Paragraph 7107(a)(1) is part of the CDA. It provides that the decision of an agency board is final unless timely appealed to the Federal Circuit. 41 U.S.C. § 7107(a)(1). The government argues that we lack jurisdiction over LFD's appeal because the Board lacked jurisdiction to enter a final decision under the CDA. That is so, the government says, because the Lease is not the type of contract covered by the CDA. In other words, the Lease is not a CDA contract.

The government is correct that we lack jurisdiction over an appeal from a final decision of the Board if that decision does not arise from a CDA contract. *See G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1026 (Fed. Cir. 1992). We do not agree with the government that we lack jurisdiction over LFD's appeal, however, because the Lease is a CDA contract.

The CDA applies to contracts made by an executive agency for:

> (1) the procurement of property, other than real property in being;
>
> (2) the procurement of services;
>
> (3) the procurement of construction, alteration, repair, or maintenance of real property; or
>
> (4) the disposal of personal property.

41 U.S.C. § 7102(a)(1)–(4). LFD acknowledges that the Lease does not reflect a procurement contract under § 7102(a)(1)–(3). *See* Appellant's Suppl. Br. 1–2. Thus, the CDA governs the Lease only if it is a contract for the disposal of personal property under § 7102(a)(4). We conclude that that the Lease is such a contract.

It is well settled that leasehold interests are items of personal property unless a statute commands otherwise. *See, e.g., Forman v. United States*, 767 F.2d 875, 879 n.4

(Fed. Cir. 1985) (reasoning that, in the CDA context, "leases are normally considered within the realm of contracts . . . and also are personal (rather than real) property" (internal citations omitted)); 1 AMERICAN LAW OF PROPERTY § 3.12 (1952); *see also, e.g.*, *Burns v. Equitable Assocs.*, 265 S.E.2d 737, 742–43 (Va. 1980); *Neuman v. Travelers Indem. Co.*, 319 A.2d 522, 525 (Md. 1974); *Abraham v. Fioramonte*, 107 N.E.2d 321, 325 (Ohio 1952); *Robertson v. Scott*, 172 S.W.2d 478, 478–79 (Tex. 1943); *State ex rel. Truitt v. Dist. Ct. of Ninth Judicial Dist., Curry Cty.*, 96 P.2d 710, 717 (N.M. 1939); *In re Craver's Estate*, 179 A. 606, 607 (Pa. 1935); *Myers v. Arthur*, 238 P. 899, 900–01 (Wash. 1925). The government has not pointed us to any federal statute defining leaseholds as real property, nor are we aware of one applicable here. LFD's right to operate a marina on the leased premises for a term of years is therefore personal, rather than real, in nature.

The only remaining question is whether the Corps "disposed" of this personal property interest when it entered into the Lease with LFD. We hold that it did. "Dispose" is a broad term meaning "to exercise control over; to direct or assign for a use; to pass over into the control of some one else; to alienate, bestow, or part with." *Disposal*, BLACK'S LAW DICTIONARY (4th ed. 1951); *see also Phelps v. Harris*, 101 U.S. 370, 380 (1879) (reasoning that "to dispose of" carries a "very broad" scope). By entering into the Lease with LFD, the Corps "bestowed," "directed," and "assigned"—and therefore disposed of—a personal property right to LFD to operate a marina on the leased premises. *See Hill v. Sumner*, 132 U.S. 118, 124 (1889) (holding that a fractional owner of a mine could "dispose of" his interest by "selling it outright, *or by leasing it*" (emphasis added)). The Lease therefore embodies a contract for "the disposal of personal property" within the purview of the CDA. 41 U.S.C. § 7102(a)(4).

Citing to legislative history, the government takes the position that the CDA's "disposal of personal property" is limited to surplus sales contracts. *See* Appellee's Suppl. Br. 12. We are not persuaded by this argument. In the first place, the legislative history does not state that § 7102(a)(4) is *limited* to surplus sales contracts. *See* S. REP. NO. 95-1118, at 18 (1978). But just as importantly, the plain words of the statute are, on their face, broad enough to encompass the type of transaction presented in this case. *See Phelps*, 101 U.S. at 380 ("The expression 'to dispose of' is very broad, and signifies more than '*to sell*.' Selling is but one mode of disposing of property."). We therefore decline to restrict the scope of the CDA to a nonlimiting example drawn from the legislative history when the statute uses unambiguously broader language. *See Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 956 (Fed. Cir. 2013) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous." (quoting *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002))).

The government argues that the CDA does not apply to concession contracts such as the Lease. Appellee's Suppl. Br. 15–19. We do not agree. As a preliminary matter, the CDA does not distinguish between concession and nonconcession contracts. The government's categorization of the Lease thus strikes us as beside the point. In any event, the nonbinding cases which the government cites are uninstructive. They either hold that concession contracts are not "procurements" (an issue not raised in this case), *see Amfac Resorts, L.L.C. v. U.S. Dep't of Interior*, 282 F.3d 818, 835 (D.C. Cir. 2002); *Frazier v. United States*, 67 Fed. Cl. 56, 59 (2005), or they rely on an inapplicable regulation involving concession contracts with the National Park Service, *see Coffee Connections, Inc. v. United States*, 113 Fed. Cl. 741, 751 (2013) (relying in part on 36 C.F.R. § 51.3, relating to concession contracts under the National Park Service Concession Policies Act

of 1965); *Terry v. United States*, 98 Fed. Cl. 736, 737 (2011) (same). The lease here does not involve the National Park Service, and the government has not explained why regulations limited to the National Park Service Concession Policies Act of 1965 should inform our analysis.

Accordingly, we hold that the Lease is a contract for "the disposal of personal property" under 41 U.S.C. § 7102(a)(4). We therefore have jurisdiction to decide this appeal.[3] 28 U.S.C. § 1295(a)(10). We turn now to the merits of the case.

## II.

LFD contends that, in granting summary judgment in favor of the Corps, the Board erred in rejecting its claim for contract reformation (Counts I and II of the amended complaint) and its claim for breach of contract (Count III of the amended complaint). In both cases, LFD asserts, there are genuine issues of material fact. We address first LFD's claim for contract reformation.

## A.

## 1.

LFD's reformation claim rests upon the allegation that, when the Corps and LFD entered into the Lease in 2000, the Corps failed to disclose to LFD the condition of the dam. According to LFD, "[t]he Corps' total silence in 2000 (and again in 2003) about the Wolf Creek Dam's being in need of major reconstruction constituted a misrepresentation (albeit by silence) regarding the material fact upon which Lee's Ford was relying – the basic soundness of the Wolf Creek Dam." Appellant's Br. 27. LFD

---

[3] Because we have jurisdiction under the CDA, we do not reach the issue of whether the Board had jurisdiction under the Lease's DISPUTES CLAUSE.

urges that, before the Board, it demonstrated (1) the existence of a material misrepresentation (by silence) on the part of the Corps as to the condition of the dam; (2) its reasonable reliance on the absence of any statement by the Corps pointing out the problems that existed with the dam; and (3) the damages it suffered when, as a result of the dam's condition, the level of Lake Cumberland had to be lowered in order to perform work on major reconstruction of the dam. *Id.* at 30. Finally, LFD argues that the Board erred as a matter of law in requiring LFD to have communicated to the Corps in 2000 its belief that there were no major problems with the dam and that it would be reluctant to enter into the Lease if there were such problems. *Id.* at 31.

The government addresses LFD's reformation claim argument in two ways. First, it contends that the Board lacked jurisdiction over the claim under the CDA because the claim was premised on an alleged misrepresentation as to the condition of the dam. Appellee's Br. 14–17. The government points out that, in *Santa Fe Engineers, Inc. v. United States*, we stated that "[o]n appeal to the Board . . . a contractor . . . may not raise any *new* claims not presented and certified to the contracting officer." 818 F.2d 856, 858 (Fed. Cir. 1987). LFD's misrepresentation claim to the Board, the government contends, was new and different from the claim LFD submitted to the District Engineer in 2013, in which it asserted that the parties were *mutually* mistaken as to the condition of the dam. Again citing to *Santa Fe*, the government argues that a claim is new if it is based upon a set of operative facts different from those that were presented and certified to the contracting officer. Appellee's Br. 14–17 (citing 818 F.2d at 858–60). Second, the government urges that, in any event, the Board did not err in granting summary judgment in favor of the Corps. According to the government, there are no genuine issues of material fact with respect to whether there was misrepresentation on the

part of the Corps, *id.* at 17–24, and with respect to whether the dam's condition was a basic assumption of the Lease, *id.* at 24–28.

## 2.

Whether the Board has jurisdiction over a claim presents a question of law we review *de novo*. *See* 41 U.S.C. § 7107(b)(1); *Sharp Elecs. Corp. v. McHugh*, 707 F.3d 1367, 1371 (Fed. Cir. 2013); *Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1010 (Fed. Cir. 1994). We agree with the government that the Board lacked jurisdiction over LFD's reformation claim.

This issue has a somewhat unusual posture in that the Board decided the merits of LFD's misrepresentation claim, *LFD II*, 16-1 BCA ¶ 36,298, at *8–12, despite having previously ruled that it lacked jurisdiction over LFD's substantively-identical superior knowledge claim. *LFD I*, 14-1 BCA ¶ 35,679, at *10–11. The Board cannot waive jurisdictional requirements, however. *See, e.g.*, *Sharp*, 707 F.3d at 1375; *W.M. Schlosser Co., Inc. v. United States*, 705 F.2d 1336, 1338 (Fed. Cir. 1983). Thus, the Board had jurisdiction to consider LFD's misrepresentation claim only if the claim complied with the jurisdictional requirements of the CDA.

The CDA requires a claimant to submit each claim "to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). This decision is a prerequisite for Board jurisdiction. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc). For this reason, the Board may not consider "new" claims a contractor failed to present to the contracting officer. *Santa Fe*, 818 F.2d at 858. A claim is new when it "present[s] a materially different factual or legal theory" of relief. *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015). Materially different claims "will necessitate a focus on a different or unrelated set of operative facts." *Placeway*

*Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990).

Here, LFD predicated its reformation claim to the Board on a different set of operative facts from those presented to the contracting officer. Before the Board, LFD sought reformation under the theory that the Corps misrepresented the condition of the Wolf Creek Dam by failing to disclose the dam's deteriorated state. *See* J.A. 113–14 ¶¶ 57–58, 60. In its original certified claim to the District Engineer, however, LFD grounded its reformation claim on mutual mistake and frustration of purpose:

> While the Lease does contemplate that the Corps has the right "to manipulate the level of the lake or pool," *the parties* could not have envisioned at the time that they entered into the Lease that the Lake would be drawn down to such an extreme degree for such a long period of time, as the Lake has only been lowered to 680' once in its more than fifty year history. Instead, all that *the parties* could have anticipated was perhaps a short-term drawn [sic] down for repairs to the Dam . . . .

J.A. 63 (emphases added). LFD's certified claim did not allege that the Corps had knowingly misrepresented the condition of the dam, by silence or otherwise. *Id.* LFD thus did not set forth operative facts supporting its later claim of misrepresentation. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS §§ 161, 164 (AM. LAW INST. 1981).[4] In fact, in *LFD I*, the Board dismissed LFD's

---

[4] The certified claim omits other operative facts relevant to a misrepresentation by silence claim, such as whether the Corps' alleged nondisclosure violated reasonable standards of fair dealing and whether LFD was justified in relying on such silence. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 161, 164 (AM. LAW INST. 1981);

superior knowledge claim on this very basis.  14-1 BCA ¶ 35,679, at *10–11.  The Board therefore did not have jurisdiction to adjudicate LFD's new claim of misrepresentation by nondisclosure.  *Santa Fe*, 818 F.2d at 858–60.  That deprives us of jurisdiction on appeal.  *Id.*

LFD responds that the Board did have CDA jurisdiction over its misrepresentation claim because, in LFD's view, its certified claim to the District Engineer supports its later-asserted misrepresentation claim.  This is so, argues LFD, because its original claim submission put the Corps on notice that the "parties' respective knowledge" on the state of the dam was pertinent to desired relief of reformation.  Appellant's Reply Br. at 7–8.  We are not persuaded by this argument.  In its certified claim, LFD confined its allegations to the Corps' supposed *mistaken belief* about the condition of Wolf Creek Dam.  J.A. 63.  Those allegations do not suggest, and are in fact logically inconsistent with, the very different notion that the Corps *knowingly misrepresented* the state of the dam.  *See K-Con*, 778 F.3d at 1006 (reasoning that a claim for "breach of contract for not constructing a building on time" is different from a claim of "breach of contract for constructing with the wrong materials"); *Santa Fe*, 818 F.2d at 858–60.

Finally, LFD cites to *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) for the proposition that claims need not invoke particular words to be effective.  LFD's reliance on *Scott* is misplaced.  *Scott* held that two claims implicating different legal theories were sufficiently similar when they arose "from the same operative facts."  333 F.3d at 1365.  For the reasons explained above, that circumstance does not exist here.

---

*see also Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 667 (Fed. Cir. 1992).

Because LFD did not properly present its reformation claim to the District Engineer, neither the Board nor we have jurisdiction over it.  We therefore dismiss LFD's reformation claim based on misrepresentation by silence. We turn now to LFD's breach of contract claim.

## B.

### 1.

LFD challenges the Board's grant of summary judgment in favor of the Corps on its breach of contract claim. LFD argues that the Corps breached the Lease by undertaking an extended drawdown of Lake Cumberland. Recognizing the Corps' right to manipulate the lake's water level under Condition 9 of the Lease, LFD urges that this right cannot be absolute and must be reasonably exercised.  Appellant's Br. 34–38.

The government responds that the Board did not err in granting summary judgment in favor of the Corps on LFD's breach of contract claim.  According to the government, Condition 9 of the Lease permits the Corps to manipulate the lake's water level "in any manner whatsoever."  Appellee's Br. 33–34.  In the government's view, this right permits the kind of extended drawdown of Lake Cumberland that occurred here.  *Id.*  The government contends that this absolute right does not render the contract illusory because the Corps did not promise to maintain any particular water level in the lake.  *Id.* at 34–37.  And even if the right to alter the water level were not absolute, the government contends, no evidence suggests that the Corps acted in bad faith or unreasonably in this case.[5]  *Id.* at 36.

---

[5]  The government does not argue that the Board lacked jurisdiction under the CDA to consider LFD's breach of contract claim.  We have no difficulty concluding

2.

We see no error in the Board's grant of summary judgment in favor of the Corps on LFD's breach of contract claim. As seen, Condition 9 of the Lease granted the Corps the right "to manipulate the level of the lake or pool *in any manner whatsoever*." J.A. 241–42 (emphasis added). As the Board noted, this provision is not limited in extent or duration. *LFD II*, 16-1 BCA ¶ 36,298, at *12–13. We therefore do not see any provision in the Lease preventing the Corps from reducing the water level of Lake Cumberland, as it did here.

LFD argues, though, that the Corps' rights under Condition 9 must be limited to "reasonable" manipulations of the water level. Appellant's Br. 38. Assuming *arguendo* that this is so, we do not see how such a restriction helps LFD. As chronicled in the IRR Memo, the Wolf Creek Dam posed a "high risk of . . . failure" endangering "imminent risk of human life, health, property, and severe economic loss." J.A. 67. LFD offered no evidence showing that the Corps acted unreasonably by reducing the lake's water level for an extended period of time in the face of these concerns. In fact, LFD conceded at oral argument that the Corps acted reasonably. Oral Argument at 54:01–54:40 (No. 16-2308), http://oralarguments. cafc.uscourts.gov/default.aspx?fl=2016-2308.mp3. LFD thus failed to raise a genuine dispute of material fact on its breach of contract claim. Summary judgment was therefore appropriate.

---

that the Board had CDA jurisdiction. In our view, LFD's certified claim of January 18, 2013 to the District Engineer asserted facts fairly supporting a breach of contract claim. *See* J.A. 63–64.

CONCLUSION

For the foregoing reasons, we dismiss LFD's contract reformation claims for lack of jurisdiction. We affirm the final decision of the Board granting summary judgment in favor of the Corps on LFD's breach of contract claim.

**AFFIRMED-IN-PART, DISMISSED-IN-PART**

COSTS

No costs.