# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of – | ) |
| | ) |
| Nassar Group International | ) ASBCA Nos. 58451, 59465, 59701 |
| | ) |
| Under Contract No. W917PM-07-C-0085 | ) |

APPEARANCE FOR THE APPELLANT: Francisco Escalante, Esq.
    Escalante Yormack Law, PLLC
    Miami, FL

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
    James D. Stephens, Esq.
    Tania Wang, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Middle East
    Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE SWEET
## ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND IN LIMINE

These appeals involve disputes arising out of a contract between the Army Corps of Engineers (Corps or government) and appellant Nassar Group International to design and build a garrison in Afghanistan. The government claims that appellant used defective concrete, and that its failure to install ground conductors was a latent defect. Appellant claims that it is entitled to an equitable adjustment for increased costs it allegedly incurred due to tax exemption and customs delays, security and political delays, and weather delays.

Appellant has filed four motions in limine. In the first motion in limine, appellant moves to exclude evidence relating to the allegedly defective concrete on spoliation grounds. Appellant argues that the government destroyed concrete samples during testing. We deny appellant's first motion in limine because other samples were available.

In its second motion in limine, appellant seeks to exclude evidence about the ground conductors. Appellant argues that the government knowingly accepted appellant's use of an alternative system. We deny appellant's second motion in limine because there is a genuine dispute as to whether the government knowingly accepted appellant's use of an alternative system.

In its third motion in limine, appellant seeks to have us deem its request for admissions (RFAs) admitted. Appellant argues that the government failed to provide a response to the RFAs within 45 days of service. We deny appellant's third motion in limine because appellant did not serve the RFAs on time, many RFAs seek statements of opinion or law, and appellant did not suffer any prejudice from the government's late responses.

In its fourth motion in limine, appellant seeks for us to take judicial notice of certain facts. We deny appellant's fourth motion in limine in part, and grant it in part.

Appellant then moves for summary judgment on the government's claims. Appellant argues that, if we grant its first three motions in limine, that would leave no genuine issue of material fact, and appellant would be entitled to judgment as a matter of law. We deny appellant's motion for summary judgment on the government's claims because we deny appellant's first three motions in limine.

Appellant also moves for summary judgment on its claims. Appellant argues that, if we grant its third motion in limine, then the deemed RFA admissions would leave no genuine issues of material fact, and it would be entitled to judgment as a matter of law. Appellant further argues that it was impossible to complete the contract within the period of performance. We deny appellant's motion for summary judgment on its claims because we deny its third motion in limine, and we do not possess jurisdiction over its impossibility claim.

Lastly, the government moves for summary judgment on appellant's claims. The government argues that appellant is not entitled to an equitable adjustment for the increased costs resulting from purported delays because the government did not cause some delays, various contract clauses preclude an equitable adjustment, appellant could have avoided those costs, the government's acts were sovereign acts, and appellant has not submitted a Critical Path Method (CPM) analysis. We deny the government's motion for summary judgment on appellant's claims to the extent that those claims are based upon government caused delays, and grant the motion to the extent appellant's claims are based upon non-government caused delays.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

*I. Factual Background*

*A. The 0085 Contract*

1. On October 23, 2007, the government awarded Contract No. W917PM-07-C-0085 (0085 Contract) to appellant for the design and construction of the Afghan National Army

(ANA) Garrison at Khair Kot, Paktika Province, Afghanistan (R4, tab 10 at 1-2).[1] As part of the construction, the 0085 Contract required that "[i]nsulated grounding conductors . . . shall be installed in all feeder and branch circuit raceways" (*id.* at 137). The 0085 Contract was a firm-fixed-price contract (*id.* at 3-33).

2. The 0085 Contract incorporated by reference several standard Federal Acquisition Regulation (FAR) clauses (*id.* at 33-35). First, it incorporated FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (*id.* at 35), which provides:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption . . . . However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor . . . .

FAR 52.242-14(b)

3. Second, the 0085 Contract incorporated FAR 52.229-6, TAXES – FOREIGN FIXED-PRICE CONTRACTS (JUN 2003), which stated that the contract price generally included all applicable taxes and duties, and would be increased by the amount of any tax excluded by the contract (R4, tab 10 at 34; *see generally* FAR 52.229-6(c-d)). FAR 52.229-6(i) required that "[t]he Contractor shall take all reasonable action to obtain exemption from or refund of any taxes or duties[.]" Pursuant to Defense Federal Acquisition Regulation (DFAR) 252.229-7001, the 0085 Contract expressly stated that "[t]he Contractor may obtain a refund of the import duties from its government or request the duty-free import of an amount of supplies or components corresponding to that used from inventory for this contract" (*id.* at 46).

4. Third, the 0085 contract incorporated FAR 52.247-34, F.O.B. DESTINATION (NOV 1991), which provided that "[t]he Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery . . . of the supplies to the destination, unless such charges are caused by an act

---

[1] Citations to page numbers are to Bates Numbers in the Rule 4 file.

3

or order of the Government acting in its contractual capacity" (R4, tab 10 at 35; FAR 52.247-34(a)(2)).

5. The 0085 Contract also contained several special provisions. First, the 0085 Contract made appellant responsible for site security; the physical security of all materials, supplies, and equipment; and attacks from hostile entities (R4, tab 10 at 53, 148, 165). As the 0085 Contract stated, "[t]he Government makes no guarantee to provide the contractor with security, and bears no obligation to reimburse the contractor for costs arising from the attacks of hostile entities" (*id.* at 165).

6. Second, the 0085 Contract authorized the contracting officer (CO) to extend the time for performance – but not to adjust prices – due to unusually severe weather delays (R4, tab 10 at 161).

7. Third, the 0085 Contract indicated that "[c]ompliance with all customs and import rules, regulations and restrictions" is appellant's sole responsibility (*id.* at 162). The 0085 Contract further stated that:

> It is the responsibility of the contractor to be knowledgeable of and to abide by any and all applicable customs clearance procedures and requirements that may be necessary for the transportation of supplies and equipment into Afghanistan . . . . The US Army Corps of Engineers, Afghanistan Engineer District, neither controls nor is responsible for any such customs clearance procedures, requirements, or changes thereto.

(*Id.* at 165)

8. Fourth, the 0085 Contract required a final acceptance inspection. The 0085 Contract also required that, at least 14 days prior to the inspection, appellant give the CO notice assuring him that all specific items previously identified as being unacceptable will be completed and acceptable by the final acceptance inspection (R4, tab 10 at 224).

*B. Performance*

9. Pursuant to the Status of Forces Agreement between the government and the Islamic Republic of Afghanistan (Afghanistan), goods imported into Afghanistan for the exclusive use of the government are not subject to taxes (R4, tab 43 at 25). In order to ensure that the government did not abuse that tax exemption, the government issued a Standard Operating Procedure (SOP) for Customs Clearance Request Operations, which outlined the process of obtaining tax exemptions (*id.*; R4, tab 42;

4

*see* SOF ¶ 7). Under the SOP, the contracting officer representative (COR) would email a Customs Clearance Request (CCR) for a Diplomatic Note to the Department of Defense Liaison Officer (LNO) at the United States Embassy (R4, tab 42 at 21). The LNO would then issue a Diplomatic Note requesting tax exemption, which certified that the goods were for the exclusive use of the United States (R4, tab 43 at 25). Appellant then had to take the CCR, Diplomatic Note, and other documents to the Afghanistan Ministry of Foreign Affairs (MoFA) and Customs at the Ministry of Finance (MoF) to obtain stamps and signatures (*id.* at 26; R4, tab 42). The SOP required that the LNO, "[o]n behalf of DOD, liaise with the Director General of Customs, MoFA and the representatives of the MoF" (R4, tab 43 at 33). The LNO also had to "[a]ssist contractors and CORs when issues arise preventing the clearance of cargo" (*id.*). Once approved by Afghanistan, the imports could clear Customs and be released for final delivery (R4, tabs 42-43).

10. According to a table submitted with appellant's claim and contemporaneous emails, it usually took the government a week or two to provide Diplomatic Notes. However, in five instances it took more than a month.[2] The table also showed that Afghanistan was slow processing tax exemption requests. (R4, tabs 50; 51 at 499, 516, 520, 525)

11. On February 10, 2010, appellant emailed the Corps, stating that letters from the Embassy would expedite the shipment of two transit mixers (R4, tab 52 at 540-42). The Corps responded the same day that it would follow-up with the Embassy (*id.*). The following day, the Corps asked appellant to prepare a letter to the United States Consulate in Karachi, Pakistan (*id.* at 544). The Consulate responded on February 14, 2010, stating that the delays were due to the shipping agent (*id.* at 554).

12. George Nassar – appellant's General Manager – submits an affidavit declaring that the government required appellant to provide site-access to "various entities," including the ANA. Those entities purportedly caused delays by compromising the security of appellant's personnel, and disrupting operations. (App. summ. judg. resp., ex. 1 ¶¶ 24-25)

13. Appellant also alleged that various security and political circumstances delayed performance (R4, tab 41 at 3). There is no evidence that the government caused those circumstances in its contractual capacity.

---

[2] In particular, it took more than a month to issue Diplomatic Notes for Bills of Lading Nos. SAFM752167246, BHBAHPKH11000064, APLU020950805, MISCDMN000007411, and ES11070067 (R4, tab 50).

14. Appellant alleged that the above delays pushed the delivery of certain goods into a period of "unusually severe weather," and "record-breaking rainfall" (ASBCA No. 58451 compl. at 15).

15. Mr. Nassar also declared that "[i]f called to testify, it would be my testimony that the delays caused by the paperwork and subsequent issues discussed throughout this affidavit, went to the critical path of the project" (app. summ. judg. resp., ex. 1 ¶ 30). In support of that assertion, Mr. Nassar declares that appellant provided and updated schedules, using the CPM, during the project (*id.* ¶ 33). He further declares that the overall project delay was due to government caused critical path delays, and not to any fault of appellant (*id.* ¶ 34).

16. In 2009 and 2010, appellant tested the concrete it had installed (app. supp. R4, tabs 241-42).

17. On November 15, 2010, the government conducted an inspection of appellant's electrical work on the project, and prepared an electrical inspection report (app. supp. R4, tab 244). The report noted that "[t]here is a great amount of electrical work that still needs to be performed [] in order to complete the work in 30 days" (*id.* at 2). The report also stated that "[t]he bellow [sic] picture indicates something that should be addressed immediately, as to limit any further delay" (*id.*). The report then reproduced a picture purporting to show a missing ground conductor (*id.*). Thereafter, the government's electrical engineer sent an email on January 29, 2011, discussing his concern with the lack of ground conductors (app. supp. R4, tab 249 at 1). There is no evidence appellant submitted a notice that it corrected that deficiency, or that there was a final inspection.

18. In July and August 2013, the government tested 54 concrete samples, destroying the samples in the process (app. supp. R4 tab 237). There is no evidence that the government used anything other than industry standard procedures for conducting the tests.

*II. Procedural History*

19. On March 16, 2012, appellant submitted a certified claim to the government (R4, tab 41). Appellant's claim sought an equitable adjustment for the demurrage, detention, replacement rental equipment, and increased overhead costs it purportedly incurred as a result of tax exemption and customs delays, security and political delays, and weather delays (*id.* at 2-4). The claim contained no factual allegations regarding whether it was possible to perform the 0085 Contract within the period of performance (*id.*).

6

20. On September 12, 2012, the CO issued a final decision (COFD) denying appellant's claim in its entirety (R4, tab 2).

21. On December 11, 2012, appellant filed a notice of appeal with the Board, which we docketed as ASBCA No. 58451.

22. On April 17, 2014, the CO sent appellant a demand for payment for concrete and electrical work deficiencies (R4, tab 234 at 4-7).

23. On May 5, 2014, appellant submitted a response to the CO's demand for payment (R4, tab 235). Appellant's response requested a COFD regarding the demand (*id.* at 1).

24. On August 7, 2014, appellant filed a notice of appeal with the Board on the basis of a deemed denial, which we docketed as ASBCA No. 59465.

25. On November 19, 2014, the CO issued a COFD, asserting a government claim for concrete and electrical work deficiencies (R4, tab 219 at 1).

26. On November 21, 2014, appellant filed a notice of appeal with the Board, which we docketed as ASBCA No. 59701.

27. On November 18, 2015, the Board issued a Revised Prehearing Scheduling Order. Under that order, the parties had to exchange expert reports by July 29, 2016. The order required the parties to comply with the expert witness disclosure and report requirements of Federal Rule of Civil Procedure 26(a)(2). Moreover, discovery closed under the order on September 30, 2016. Appellant did not seek an extension of that deadline.

28. According to an affidavit from Mr. Nassar, appellant sent an employee to the garrison to obtain a concrete sample in the spring of 2015. While he contends that appellant attempted to coordinate access beforehand, he does not specify how. The ANA denied appellant access. (App. reply in support of mot. in limine for spoliation, ex. A)

29. On August 13, 2016, appellant requested that the government assist appellant in obtaining access to the garrison so appellant could collect concrete samples (gov't first mot. in limine resp. ex. B). In a September 15, 2016 email, appellant stated that it was "working on the list of attendees for the Afghanistan visit and some suggested dates" (*id.* at ex. C). It is unclear whether the September 15, 2016 email was even a following-up on its August 13, 2016 request for assistance in

7

obtaining garrison access. Even assuming it was, there is no evidence that appellant provided the government a list of attendees or suggested dates.[3]

30. On August 31, 2016 – less than 45 days before the September 30, 2016 discovery deadline—appellant served RFAs on the government (app. combined motions, ex. A).[4] Some of the RFAs sought statements of opinion or law. For example, paragraph 25 requested that the government "[a]dmit or deny that [appellant] is entitled to a judgment for and to recover damages in the amount of $8,774,283.84 for the breaches discussed in [paragraphs] 10 through 24" (*id.* at 3). Similarly, paragraph 32 requested that the government "[a]dmit or deny that [appellant] is entitled to recover $8,774,283.84 for the breaches discussed in paragraphs 25 through 31" (*id.* at 4). The government did not respond to the RFAs until its Third Motion in Limine Response (gov't third mot. in limine resp. at 2-3). Appellant has not shown prejudice from those late RFA responses.

31. Appellant submitted its witness list. That witness list did not identify Mr. Nassar as an expert (Bd. corr. dtd. Oct. 14, 2016 at 2-3).

DECISION

*I. Appellant's Motions in Limine*

*A. Appellant's First Motion in Limine (Spoliation)*

The government's destruction of concrete samples during testing did not constitute spoliation justifying exclusion of all evidence regarding allegedly defective concrete. The party seeking sanctions for spoliation bears the burden of establishing that:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or

---

[3] In its reply, appellant makes various allegations regarding steps it purportedly took to coordinate a site-visit with the government, but cites no evidence to support those allegations. In any event, appellant's allegations do not establish that concrete samples have been unavailable. The allegations merely show that appellant made the litigation decision to prioritize other discovery (app. reply in support of mot. in limine for spoliation at 7-8).

[4] While the RFAs state that appellant served the RFAs on August 31, 2015, that clearly was a typographical error because the transmitting email was dated August 31, 2016 (app. combined motions, ex. A).

8

altered was "relevant" to the claims or defenses of the
party that sought the discovery of the spoliated evidence,
to the extent that a reasonable factfinder could conclude
that the lost evidence would have supported the claims or
defenses of the party that sought it.

*Ensign-Bickford Aerospace & Defense Co.*, ASBCA No. 57929, 13-1 BCA ¶ 35,322
at 173,385 (internal citations omitted). The destruction of the only sample during
testing may constitute spoliation. *Northrop Grumman Corp.*, ASBCA Nos. 52178,
52784, 52785, 53699, 03-2 BCA ¶ 32,278 at 159,702-05. However, sample
destruction does not constitute spoliation if other samples were available. *Id.*

Here,[5] appellant has not shown that additional concrete samples were
unavailable. Appellant's vague allegations about a single visit to the garrison is
insufficient to establish that additional samples were unavailable (SOF ¶ 28). On the
contrary, the fact that the parties attempted to arrange for appellant to obtain an
additional concrete sample during discovery – which apparently failed due to
appellant's inaction – suggests additional samples were available (SOF ¶ 29).[6]
Because appellant has not shown that additional samples were unavailable, the
destruction of samples during testing did not constitute spoliation. Therefore, we deny
appellant's first motion in limine.

*B. Appellant's Second Motion in Limine (Latent Electrical Defects)*

Appellant is not entitled to the exclusion of evidence concerning insulated
ground conductors because there are genuine issues of fact as to whether the
government knowingly accepted appellant's installation of a different system than
ground conductors (app. combined motions at 2-3). "A latent defect is usually defined
as one that is hidden from the knowledge as well as from the sight and which could not
be discovered by ordinary and reasonable care or by a reasonable inspection."
*Geranco Mfg. Corp.*, ASBCA No. 12376, 68-1 BCA ¶ 6,898 at 31,861 (internal
citations omitted). Therefore, a "defect" is not latent if the government knows of the
purported defect, and nevertheless accepts delivery. *States Marine Corp.*, ASBCA
No. 4779, 59-2 BCA ¶ 2,463 at 11,618; *Hercules Engineering &Mfg. Co.*, ASBCA
No. 4979, 59-2 BCA ¶ 2,426 at 11,417. Here, a reasonable fact-finder could find that
the government did not knowingly accept the alternative system based upon the

---

[5] We need not – and do not – decide whether the government had an obligation to
preserve when it destroyed the samples because, as discussed above, there was
no spoliation, even assuming such an obligation to preserve existed.

[6] Appellant's arguments about the purportedly small concrete sample size go to the
weight – and not the admissibility – of the samples (app. reply in support of
mot. in limine for spoliation at 5-6).

evidence that the November 15, 2010 report identified the lack of ground conductors as a deficiency, there appears to have been no notice that appellant corrected that deficiency, and there appears to have been no final acceptance inspection (SOF ¶ 17). Because there is a genuine dispute as to whether the government knowingly accepted the alternative system, we deny appellant's second motion in limine.

### C. Appellant's Third Motion in Limine (RFAs)

We do not deem that the government admitted the RFAs (app. combined motions at 3-4). Under Board Rule 8(c)(2), a party may serve "[a] request for admission of specified facts . . . to be answered or objected to within 45 days after service, the factual statements . . . to be deemed admitted upon failure of a party to respond to the request[.]" A proper RFA will request admissions of fact, as opposed to statements of opinion or law. *Rust Manufacturing, Inc.*, ASBCA No. 27511, 84-3 BCA ¶ 17,518 at 87,234. Absent good cause and a motion to extend the discovery deadline, a movant generally must serve RFAs at least 45 days prior to the close of discovery. *See, e.g., Alaska Comm. Action on Toxics v. Aurora Energy Services, LLC,* 2012 WL 12537417 at *3 n.36 (D. Alaska April 4, 2012) (unreported decision) (internal citations omitted) (compiling cases requiring a party serving discovery to give the responding party sufficient time to respond prior to the close of discovery). Moreover, a movant must establish prejudice from any late RFA responses. *Morris Guralnick Assoc., Inc.*, ASBCA No. 41888, 91-2 BCA ¶ 23,859 at 119,548; *W.H. Moseley Co.*, ASBCA No. 28604, 88-1 BCA ¶ 20,506 at 103,674.

Here, appellant served its RFAs less than 45 days prior to the close of discovery, without good cause or seeking an extension (SOF ¶ 30). Moreover, many of the RFAs requested statements of opinion or law (*id.*). Nor has appellant shown any prejudice from the government's late responses (*id.*). Therefore, we deny appellant's third motion in limine, and permit the government's late RFA responses.

### D. Appellant's Fourth Motion in Limine (Judicial Notice)

We take judicial notice of some – but not all – of the purported facts offered by appellant. We may take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).[7] Here, we decline to take judicial notice of the purported facts that "NATO supplies blocked in June, July and September 2010," and "visit of NATO personnel to Torkham boarder, which closed

---

[7] While not binding on us, we may look to the Federal Rules of Evidence for guidance. *ERKA Constr. Co., LTD*, ASBCA Nos. 57618, 58515, 16-1 BCA ¶ 36,301 at 177,023.

10

from October 26, 2010 through October 31, 2010" because those purported facts are vague, not generally known, and not accurately and readily determined from a source provided by appellant whose accuracy cannot be questioned (app. combined motions at 4). However, we take judicial notice of the facts that Osama bin Laden died in April 2011, a President of Afghanistan was assassinated in September 2011, and Pakistan closed the border in November 2011, following a NATO air strike, because the government does not object to us taking judicial notice of those facts, other than based upon their relevance.

## II. Summary Judgment Motions

### A. Standard of Review

Summary judgment is appropriate only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine" dispute as to such a fact "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.*

### B. Appellant's Motion for Summary Judgment on the Government's Claims

Appellant is not entitled to summary judgment on the government's claims. Appellant argues that, if we grant its first three motions in limine, then that would leave no genuine issues of material fact, and it would be entitled to judgment as a matter of law on the government's claims (app. combined motions at 5). However, as discussed above, we deny appellant's first three motions in limine. Therefore, we also deny appellant's motion for summary judgment on the government's claims.

### C. Appellant's Motion for Summary Judgment on Its Claims

Nor is appellant entitled to summary judgment on its claims. Appellant first argues that, if we deem the RFAs admitted pursuant to its third motion in limine, then those RFA admissions would leave no genuine issue of material fact, and appellant would be entitled to judgment as a matter of law on its claim (app. combined motions at 5-6). However, as discussed above, we do not deem that the government admitted the RFAs. Therefore, we deny appellant's motion for summary judgment on its claims based upon the deemed RFA admissions.

Second, appellant argues that it was impossible to perform the 0085 Contract within the period of performance (app. combined motions at 5-6). We do not possess jurisdiction over that claim. The Board does not possess jurisdiction to entertain a claim if it is a new claim that appellant did not present to the CO. *Monica Walker*,

11

ASBCA No. 60436, 16-1 BCA ¶ 36,452 at 177,657 (internal citations omitted). While an appellant may introduce on appeal additional facts that do not alter the nature of the original claim, its appeal must be based upon a common or related set of operative facts to those presented to the CO. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003); *Trepte Const. Co., Inc.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86. A claim is new when it "present[s] a materially different factual or legal theory" of relief. *Lee's Ford Dock, Inc. v. Secretary of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017) quoting *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1006 (Fed. Cir. 2015)). "Materially different claims 'will necessitate a focus on a different or unrelated set of operative facts.'" *Id.* (quoting *Placeway Constr. Comp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)).

Appellant's claim did not set forth operative facts supporting a claim for impossibility of performance (SOF ¶ 19). Therefore, we do not possess jurisdiction over appellant's impossibility claim. *Lee's Ford Dock*, 865 F.3d at 1369.

### D. The Government's Motion for Summary Judgment on Appellant's Claims

The government's motion for summary judgment is denied on appellant's claim for an equitable adjustment for government caused delay, but granted on appellant's claim for an equitable adjustment for non-government caused delays. Under FAR 52.242-14, a contractor is entitled to an equitable adjustment when the government constructively suspends work by delaying work for an unreasonable amount of time. *CATH-dr/Balti Joint Venture*, ASBCA Nos. 53581, 54239, 05-2 BCA ¶ 33,046 at 163,793 (citing *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359 (Fed. Cir. 2002)); *see also E.V. Lane Corp.*, ASBCA No. 9741, *et al.* 65-2 BCA ¶ 5,076, at 23,884-88. However, a contractor is not entitled to an equitable adjustment for delays with other causes besides the government's conduct or inaction. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000); *E.V. Lane*, 65-2 BCA ¶ 5,076, at 23,892-95.

Here, as discussed in greater detail below, the government is not entitled to judgment as a matter of law on appellant's claims for an equitable adjustment for purported delays caused by the government's late issuance of Diplomatic Notes and providing site-access to disruptive entities because there are genuine issues of material fact as to whether those constitute unreasonable government caused delays. However, the government is entitled to judgment as a matter of law on appellant's claims for an equitable adjustment for purported delays caused by Afghanistan's slow tax exemption and customs processing, security and political circumstances, and the weather because there is no genuine issue of material fact suggesting that those constitute government caused delays.

12

*i. Claims Based Upon Government Caused Delays*

The government is not entitled to judgment as a matter of law on appellant's claims for an equitable adjustment for purported delays caused by the government's late issuance of Diplomatic Notes and providing site-access to disruptive entities because there are genuine issues of material fact as to whether those constitute unreasonable government caused delay. Regarding the Diplomatic Notes, there are genuine issues of material fact as to how long it took the government to issue each Diplomatic Note, and whether that length of time was unreasonable in each instance (SOF ¶ 10). Regarding the provision of site-access to disruptive entities, there are genuine issues of material facts as to whether the government unreasonably required appellant to provide access to disruptive entities, whether that caused delay, and whether those delays are attributable to the government (SOF ¶ 12).

In response, the government first argues that 0085 contract clauses FAR 52.229-6 and DFARS 252.229-7001 do not create a right to payment for any costs incurred as a result of tax exemption processing, and instead limit appellant to a refund of any taxes it paid (gov't summ. judg. mot. at 14-15). However, appellant is not bringing this claim for a breach of FAR 52.229-6 or DFARS 252.229-7001. Rather, it is claiming an equitable adjustment for delays. Appellant is entitled to an equitable adjustment for costs incurred as a result of any unreasonable government caused delays in tax exemption processing under a constructive suspension theory. *CATH-dr/Balti Joint Venture*, 05-2 BCA ¶ 33,046 at 163,793.

Second, the government argues that any delays did not cause the demurrage, detention, replacement rental equipment, and increased overhead costs for which appellant seeks an equitable adjustment because appellant could have avoided those costs by paying the taxes, and seeking reimbursement from the government (gov't summ. judg. mot. at 16-17). However, FAR 52.229-6 required appellant to make all reasonable efforts to obtain tax exemptions before the government would reimburse appellant (SOF ¶ 3). It may be inferred that it was reasonable for appellant to wait for the government to issue Diplomatic Notes, and thus that the government would not have reimbursed appellant if it had paid the taxes instead of waiting for the Diplomatic Notes.

Third, the government argues that FAR 52.247-34 purportedly prohibited the payment of demurrage and detention costs (gov't summ. judg. mot. at 17). However, FAR 52.247-34 provided that "the Government shall not be liable for any delivery, storage, demurrage, accessorial, or other charges involved before the actual delivery . . . of the supplies to the destination, <u>unless such charges are caused by an act or order of the Government acting in its contractual capacity</u>" (SOF ¶ 4) (emphasis added). Under the emphasized exception, the government was liable for demurrage and detention costs

13

incurred as a result of delays caused by the government acting in its contractual capacity (*id.*).

Fourth, the government argues that appellant is not entitled to an equitable adjustment for any delays caused by the Embassy because its actions in issuing Diplomatic Notes were sovereign acts (gov't summ. judg. mot. at 18). Under the Sovereign Acts Doctrine, the government is not liable for delays caused by the government's public and general acts as a sovereign, as opposed to its acts as a contracting party. *Conner Bros. Constr. Co., Inc. v. Green*, 550 F.3d 1368, 1372-73 (Fed. Cir. 2008). An act is a public and general sovereign act if it is general and applies to all persons (*id.*). Here, the evidence suggesting that the purpose of the Diplomatic Notes was to allow appellant to seek a tax exemption on goods to be used exclusively to perform of the 0085 Contract for the government raises a genuine issue of material fact as to whether the Embassy was performing a public and general act applicable to all persons (SOF ¶ 9). Therefore, the government is not entitled to summary judgment on its sovereign acts affirmative defense.

Finally, the government argues that it is entitled to judgment as a matter of law because appellant presents no CPM analysis (gov't summ. judg. mot. at 22-23). In order to recover for a delay, an appellant must establish – usually through the CPM – that the government caused delay delayed the ultimate project completion, and that there was no concurrent delay. *Law v. United States*, 195 Ct. Cl. 370, 384-86 (1971); *Safety Training Sys., Inc.*, ASBCA Nos. 57095, 57166, 14-1 BCA ¶ 35,509 at 174,055 (*quoting American Ordinance, LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,795); *Galaxy Builders, Inc.*, ASBCA Nos. 50018, 50136, 00-2 BCA ¶ 31,040 at 153,282. Here, Mr. Nassar's declares that appellant used CPM schedules throughout the project, that the paperwork and subsequent issues went to the critical path of the project, that the overall project delay was due to government caused critical path delays, and that there was no concurrent delay. (SOF ¶ 15) That declaration raises genuine issues of material fact as to whether the government delayed the overall project, and whether there was concurrent delay. The government replies that a fact-finder could not rely upon Mr. Nassar because appellant has not designated him as an expert (gov't summ. judg. reply at 5). However, the government does not cite any authority requiring appellant to use a CPM expert (*id.*; *see also* Cibinic and Nash, ADMINISTRATION OF GOVERNMENT CONTRACTS 541 (5th ed. 2016)).

As a result, the government has not shown that it is entitled to summary judgment on appellant's claims for an equitable adjustment for delays caused by the government's late issuance of Diplomatic Notes and providing site-access to disruptive entities.

14

*ii. Claims Based Upon Non-Government Caused Delays*

The government is entitled to judgment as a matter of law on appellant's claims for an equitable adjustment for purported delays caused by Afghanistan's slow tax exemption and customs processing, security and political circumstances, and the weather because there are no genuine issues of material fact suggesting that the government caused those delays (SOF ¶¶ 10-15). It "is well settled that the U.S. government is not liable for delays caused by foreign governments." *Contrak International, Inc.*, ASBCA No. 59917, 16-1 BCA ¶ 36,532 at 177,954-55. Moreover, the 0085 Contract expressly provided that appellant was responsible for customs and security (SOF ¶¶ 5, 7). Also, there is no genuine issue at material fact suggesting that the government caused the security and political circumstances (SOF ¶ 13). Finally, while authorizing the CO to allow additional time for severe weather delays, the 0085 Contract did not indicate that appellant was entitled to compensation for any weather delays (SOF ¶ 6).

Appellant attempts to shift the cost of Afghanistan's customs delays onto the government by arguing that, while the government provided assistance in obtaining approvals from Afghanistan, that assistance was "ineffective," in violation of the SOP (app. summ. judg. resp. at 10, 14). However, the SOP only required the government to provide assistance. It did not guarantee that that assistance would be effective. (SOF ¶ 9) On the contrary, the 0085 Contract expressly stated that the Corps "neither controls nor is responsible for any such customs clearance procedures" (SOF ¶ 7).

In fact, an examination of the only specific instance cited by appellant – namely the transit mixers – confirms that the government took reasonable steps to provide assistance, and that appellant's real complaint is that the government was not effective in persuading Afghanistan to act quicker (app. summ. judg. resp. at 15). In that instance, the Corps immediately responded to a request from appellant for a letter from the DOS by requesting such a letter (SOF ¶ 11). Within a matter of days, the Consulate responded that the cause of the delay was the shipping agent (*id.*). Indeed, appellant does not complain that the government's conduct was unreasonable, but rather that it took Afghanistan about two months to allow the mixers into Afghanistan (app. summ judg. resp. at 15). However, nowhere in the SOP did the government guarantee that Afghanistan would act promptly in response to the government's reasonable efforts to assist appellant (SOF ¶ 9). Thus, appellant cannot use the government's promise to assist appellant to shift responsibility for Afghanistan's customs delay onto the government.

Appellant also attempts to shift the costs of weather delays onto the government by arguing that government caused delays pushed performance into a period of severe weather (app. summ. judg. resp. at 3). A contractor is entitled to an additional equitable adjustment when a government delay pushes a contractor's performance into

15

a period of seasonal adverse weather—such as a rainy season—but a contractor is not entitled to such an adjustment when the government's delay pushes the contractor's performance into a period of unusual adverse weather because the additional weather delay is not reasonably foreseeable in that case. *DTC Engineers & Constructors, LLC*, ASBCA No. 57614, 12-1 BCA ¶ 34,967 at 171,898; *Charles G. Williams Const., Inc.*, ASBCA No. 42592, 92-1 BCA ¶ 24,635 at 122,930. Here, there is no genuine issue of material fact suggesting that purported government-caused delays pushed performance into a period of seasonal adverse weather. Rather, appellant alleges that government caused delays pushed performance into a period of "unusually severe weather" and "record-breaking rainfall" (SOF ¶ 14). Therefore, the government is entitled to judgment as a matter of law on appellant's claim for an additional equitable adjustment due to weather delays. *Charles G. Williams Const.*, 92-1 BCA ¶ 24,635 at 122,930.

As a result, the government is entitled to summary judgment on appellant's claims for an equitable adjustment for purported delays caused by Afghanistan's slow tax exemption and customs processing, security and political circumstances, and the weather.

## CONCLUSION

Appellant's four motions in limine are denied, except for a portion of the fourth motion in limine. We take judicial notice of the facts that Osama bin Laden died in April 2011, a President of Afghanistan was assassinated in September 2011, and Pakistan closed the border in November 2011, following a NATO air strike. Further, we permit the government's late RFA responses.

Appellant's motions for summary judgment on its claims and the government's claims are denied. The government's motion for summary judgment on appellant's claims for an equitable adjustment for purported delays caused by the government's late issuance of Diplomatic Notes and providing site-access to disruptive entities is denied. The government's motion for summary judgment on appellant's claims for an equitable adjustment for purported delays caused by Afghanistan's slow tax exemption and customs processing, security and political circumstances, and the weather is granted. We strike the portion of the complaint related to those claims.

An order addressing further proceedings in these appeals will follow.

Date: August 1, 2019

*James R. Sweet*

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

*Owen C. Wilson*

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

*Michael N. O'Connell*

MICHAEL N. O'CONNELL
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58451, 59465, 59701, Appeals of Nassar Group International, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals