ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Nassar Group International N.G.I. S.A.L. | ) | ASBCA Nos. 58451, 59465, 59701 |
| (OffShore) R.C., doing business as NGI | ) | |
| Afghanistan for Contracting[1] | ) | |
| | ) | |
| Under Contract No. W917PM-07-C-0085 | ) | |

APPEARANCE FOR THE APPELLANT:     Francisco Escalante Esq.
      Escalante Law, P.A.
      Miami, FL

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
      Engineer Chief Trial Attorney
    Rebecca L. Bockmann, Esq.
    Traci N. Cunningham, Esq.
      Engineer Trial Attorneys
      U.S. Army Engineer District, Middle East
      Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE SWEET

These appeals involve disputes arising out of a contract between the Army Corps of Engineers (Corps or government) and appellant Nassar Group International N.G.I. S.A.L. (OffShore) R.C., doing business as NGI Afghanistan for Contracting (the Appellant) to design and build a garrison in Afghanistan. For its claim, the Appellant asserts that the government constructively suspended the contract by delaying the issuance of documents needed to obtain tax exemptions for imports from the Government of the Islamic Republic of Afghanistan (GIRoA), and mandating site-access for the United States Army (Army) and the Afghan National Army (ANA). The government also asserts a claim to reduce the contract price due to the Appellant's alleged failure to install insulated grounding conductors separate from the electrical system neutral conductor in all feeder and branch circuit raceways. The parties have elected to proceed under Board Rule 11. In its Rule 11 Brief, the government moves to dismiss these appeals on the grounds that the original named appellant—Nassar Group International—was not the real party in interest.[2] The Appellant opposes that motion, and cross-moved to amend the caption.

---

[1] As discussed in greater detail below, we grant the Appellant's motion to amend the caption.

[2] Following briefing, we held a hearing limited to the real party in interest issue.

After having reviewed the parties' briefs and other filings, we deny the government's motion to dismiss, and grant the Appellant's cross-motion to amend the caption. We deny the Appellant's claim regarding the tax exemption documents because the procedure for issuing those documents was a sovereign act, and, in any event, the Appellant has failed to meet its burden of showing that there were unreasonable delays in issuing the tax exemption documents that delayed the contract. We also deny the Appellant's claim that the government delayed the project by mandating site-access for the Army and the ANA because that is a new claim over which we do not possess jurisdiction and, in any event, the Appellant waived that claim. Finally, we deny the government's claim because it has failed to satisfy its burden of showing that the Appellant did not install insulated grounding conductors separate from the electrical system neutral conductor in all feeder and branch circuit raceways.[3]

FINDINGS OF FACT

I.      The Appellant's Structure

1. Nassar Group International N.G.I. S.A.L. (OffShore) R.C. registered in Lebanon as an off-shore joint stock company (Nassar Decl. (app. reply ex. 1) (Nassar decl. II) ¶ 1(c), ex. A).[4]

2. When Nassar Group International N.G.I. S.A.L. (OffShore) R.C. began doing business in Afghanistan in 2007, it registered with the GIRoA's Trade, Transit and Investment Directorate as Nassar Group International N.G.I. S.A.L. (OffShore) (Nassar decl. II ex. B).

3. Nassar Group International N.G.I. S.A.L. (OffShore) R.C. used the name "NGI Afghanistan for Contracting" (Nassar decl. II ¶ 1(g)). NGI Afghanistan for Contracting was a wholly-owned subsidiary of Nassar Group International (app. br. ex. D at 2). However, NGI Afghanistan for Contracting was not a separate legal entity (tr. 16; Nassar decl. II ¶ 12). For example, there is no official documentation creating or recognizing NGI Afghanistan for Contracting as a separate legal entity, such as articles of incorporation (tr. 16).

4. During performance, the government treated Nassar Group International N.G.I. S.A.L. (OffShore) R.C. and NGI Afghanistan for Contracting as the same entity. While the contract was with NGI Afghanistan for Contracting (R4, tab 10 at 1-2), the

---

[3] We grant the government's motion in limine to admit certain documents.

[4] The parties seem to use "Nassar Group International" or "NGI" as short-hand for Nassar Group International N.G.I. S.A.L. (OffShore) R.C., including in the original caption. *See, e.g.*, (compl.; gov't br. at 24; app. reply at 6-8). For clarity, we will use the full name.

2

government made payments to Nassar Group International N.G.I. Offshore S.A.L. in Lebanon (Nassar decl. II ex. D).

5. Nassar Group International N.G.I. S.A.L. (Offshore) R.C. and NGI Afghanistan for Contracting have different Commercial and Government (CAGE) codes (*compare* R4, tab 10 at 2 *with* gov't reply ex. G) and Data Universal Numbering System (DUNS) codes (tr. 30-31).[5] The Appellant registered Nassar Group International N.G.I. S.A.L. (Offshore) R.C. and NGI Afghanistan for Contracting with different DUNS numbers because it was the Appellant's first time working with the government, and it was not familiar with the DUNS system (tr. 31).

II. The Appellant's Claim

A. The 0085 Contract

6. On October 23, 2007, the government awarded Contract No. W917PM-07-C-0085 (0085 Contract) to NGI Afghanistan for Contracting. The 0085 Contract was for the design and construction of an ANA Garrison at Khair Kot, Paktika Province, Afghanistan. (R4, tab 10 at 1-2) The period of performance was 240 calendar days (*id*. at 3).

7. The 0085 Contract required the Appellant to prepare and submit progress schedules every month using the Critical Path Method (CPM) of network calculation (R4, tab 10 at 190). The 0085 Contract also indicated that the project schedules shall be used to measure the progress of the work, evaluate time extensions, and provide a basis for progress payments (*id*.).

8. The 0085 Contract incorporated by reference Federal Acquisition Regulation (FAR) 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 10 at 35), which provided that:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting

---

[5] According to DFARS 252.204-7004, CENTRAL CONTRACTOR REGISTRATION (52.204-7), Alternate A (Nov. 2003), which was incorporated into the solicitation, a CAGE code is a "code assigned by the Defense Logistics Information Service (DLIS) to identify a commercial or Government entity" (R4, tab 3 at 35). According to DFARS 252.204-7004 a DUNS number is a "9-digit number assigned by Dun and Bradstreet, Inc. (D&B) to identify unique business entities." (*id*.).

Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption . . . However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor.

FAR 52.242-14(b).

9. The 0085 Contract also incorporated FAR 52.229-6, TAXES-FOREIGN FIXED-PRICE CONTRACTS (JUN 2003), which stated that the contract price generally included all applicable taxes and duties (R4, tab 10 at 34; *see generally* FAR 52.229-6(c)-(d)). FAR 52.229-6(i) required that "[t]he Contractor shall take all reasonable action to obtain exemption from or refund of any taxes or duties . . . ." Pursuant to Defense Federal Acquisition Regulation (DFAR) 252.229-7001, the 0085 Contract expressly stated that "[t]he Contractor may obtain a refund of the import duties from its government or request the duty-free import of an amount of supplies or components corresponding to that used from inventory for this contract" (R4, tab 10 at 46). The 0085 Contract also stated that "[c]ompliance with all customs and import rules, regulations, and restrictions" is the Appellant's sole responsibility (R4, tab 10 at 162). Finally, the 0085 Contract indicated that:

It is the responsibility of the contractor to be knowledgeable of and to abide by any and all applicable customs clearance procedures and requirements that may be necessary for the transportation of supplies and equipment into Afghanistan . . . . The US Army Corps of Engineers, Afghanistan Engineer District, neither controls nor is responsible for any such customs clearance procedures, requirements, or changes thereto.

(*Id*. at 165)

B. The CCR Procedure

10. Pursuant to the Status of Forces Agreement (SOFA) between the government and the GIRoA, goods imported into Afghanistan for the exclusive use of the government were not subject to taxation (R4, tab 43 at 25). The United States Embassy in Kabul issued a Standard Operating Procedure (SOP) for Customs

4

Clearance Request (CCR) Operations, which outlined a procedure for obtaining tax exemptions (*id.*). The express purpose of the SOP was "to ensure that the procedures used to import/export [] goods and supplies, for use by [the United States Government and the Department of Defense (DOD)] comply with the terms and conditions according to those arrangements made under the SOFA" and that the tax "exemption is not abused" (*id.*). There is nothing in the SOP suggesting that the government adopted the CCR procedure specifically to nullify a right under the 0085 Contract or relieve the government of its contractual obligations (*id.*). The CCR procedure applied to "all US Federal Agencies, US Military, DOD Civilians, contract companies or supplies contracted by the US, or any other organization that intends to import or export goods for the ultimate consumption of DOD personnel" (*id.*).

11. The SOP did not indicate how an importer—such as a contractor, supplier, shipping agent, or carrier—should commence the CCR procedure (R4, tab 43 at 21, 45) Rather, the SOP started with the contracting officer's representative (COR) emailing a CCR for a Diplomatic Note to the Liaison Officer (LNO) at the United States Embassy. (R4, tab 43 at 21, 45). Then, the importer was responsible for providing the LNO: (1) a bill of lading, Airway bill, or contract of carriage; (2) a commercial invoice; (3) a customs declaration; and (4) a packing list (collectively, Importer Documents) (*id.* at 25-26, 46).[6] Third, the United States Department of State (DOS) would issue a Diplomatic Note requesting tax exemption (*id.* at 26). Next, the importer took the CCR, Diplomatic Note, and other documents to the GIRoA Ministry of Foreign Affairs (MoFA) and Customs at the GIRoA Ministry of Finance (Customs) to obtain stamps and signatures (*id.*). Once approved by the GIRoA, the imports could clear Customs and be released for final delivery (*id.* at 46).

12. The SOP did not indicate how long it should take the government to issue CCRs or Diplomatic Notes (R4, tab 43 at 21). The SOP indicated that the process time could vary between 2 days and 10 days for the MoFA, and should be between 5 days and 7 days for Customs, but noted that the time would be much longer if the expediter does not check with Customs frequently (*id.* at 43).

---

[6] The Appellant claims that only a flow chart in a power point required an importer to submit the Importer Documents, and that that flow chart was inconsistent with the SOP requirement that only the COR could send electronic documents to the LNO (app. br. ¶ 7). However, the SOP also required an importer to submit the Importer Documents, and that requirement was not inconsistent with the requirement that only the COR could send electronic documents because the SOP clearly stated that the importer should provide the LNO "hard copy documents" (R4, tab 43 at 25-26).

C. Performance

13.  As modified, the contract completion date was August 8, 2012 (R4, tabs 37, 40).

14.  The Appellant claims that the following delays occurred in the government issuing the CCRs and the Diplomatic Notes:

**Table 1:  Claimed CCR and Diplomatic Note Delays**

| (a) Shipment | (b) Date Request to Corps | (c) Date CCR Issued (# of days from request) | (d) Date Diplomatic Note Issued (# of days from CCR) | (e) Claimed Delay (days)[7] |
|---|---|---|---|---|
| 1.  AC Units (BHBAHPKHI1000064) | **01/06/11** | 02/10/11 **(36)** | 02/24/11 (14) | 40 |
| 2.  Electrical Items (MAEU861652858) | **04/02/11** | 04/04/11 **(3)** | 05/17/11 (43) | 36 |
| 3.  Load Bank | **04/04/11** | **04/18/11 (15)** | **04/23/11 (5)** | 0 |
| 4.  Panel Boards | **04/02/11** | 04/05/11 **(4)** | 05/12/11 (37) | 0 |
| 5.  Electrical Cables (CMR#015952) | **04/11/11** | **04/18/11 (8)** | **04/24/11 (5)** | 0 |
| 6.  Cables (016478) | 04/18/11 | 04/25/11 (8) | **06/07/11 (43)** | 21 |
| 7.  PEB, KSA (ES11030067) | 05/17/11 | **06/04/11 (19)** | **06/30/11 (26)** | 23 |
| 8.  Ceiling Diffuser (TR1322961) | 05/30/11 | 06/08/11 (10) | **06/21/11 (13)** | 0 |
| 9.  Lighting Fixtures | 06/04/11 | 06/20/11 (17) | 07/06/11 (16) | 6 |
| 10.  Electrical Materials | 06/04/11 | 06/20/11 (17) | 07/06/11 (16) | 0 |

---

[7] The Appellant calculated the claimed delay by first subtracting 10 days—which the Appellant asserts was the reasonable time it should have taken after receiving a request for the government to issue a Diplomatic Note—from the number of days it actually took after receiving a request for the government to issue a Diplomatic Note.  Then, the Appellant subtracted days that overlapped with any purported delays in issuing a diplomatic note on a different shipment (app. br. 8-10, *id*. at ex. A (Nassar decl.) ¶¶ 6-9).  It appears that the Appellant includes both the first and last day of a purported delay period.

| | | | | |
|---|---|---|---|---|
| 11. Electrical Materials | **05/29/11** | 06/23/11 **(26)** | 07/12/11 (19) | 6 |
| 12. PEB, KSA (ES11070013) | **07/17/11** | 07/18/11 **(2)** | 09/16/11 (60) | 52 |
| 13. PEB, KSA (MISCCDMN000007411) | **09/02/11** | 10/04/11 **(33)** | **11/15/11 (42)** | 65 |
| TOTAL | | | | 249 |

(App. br. at 8-10; Nassar decl. (app. br. ex. A) (Nassar decl. I) ¶¶ 6-9)  In support of that claim, the Appellant provides a declaration from George Nassar—the Appellant's managing officer—who attaches bills of lading, CCR requests from the Appellant, CCRs, and Diplomatic Notes (Nassar decl. I, ex. A).  However, Mr. Nassar only attaches the CCR requests for shipments 6 to 10; he does not provide or identify the CCR requests for shipments 1 to 5, or 11 to 13 (*id.*).  Nor do the bills of lading—or any other document provided by Mr. Nassar—demonstrate that the Appellant requested the CCRs on the dates indicated in column (b) for shipments 1 to 5, or 11 to 13 (*id.*).  Likewise, Mr. Nassar only attaches the CCRs for shipments 1, 2, 4, 6, and 8 to 12; he does not provide or identify the CCRs for shipments 3, 5, 7, or 13 (*id.*).  Further, Mr. Nassar only attaches the Diplomatic Notes for shipments 1, 2, 4, and 9 to 12; he does not provide or identify the Diplomatic Notes for shipments 3, 5 to 8,[8] or 13 (*id.*).  Therefore, we find that the Appellant has only substantiated the dates in Table 1, columns (b) to (d) that are not bold, and that it has not substantiated the dates in Table 1, columns (b) to (d) that are bolded.

    C.  Procedural History

15.  On July 22, 2011, the Appellant submitted a Request for an Equitable Adjustment (REA), asserting that the government failed to escort Afghan National Police (ANP) members off-base after a site-visit on June 24, 2011, and the ANP proceeded to harass the Appellant's owner in an attempt to extort money from him until the Army arrived (app. supp. R4, tab 262).  The contracting officer (CO) rejected the REA (app. supp. R4, tab 263).  On September 22, 2011, the Appellant filed a purported claim regarding the incident (collectively with the June 22, 2011 REA, September 22, 2011 Purported Claim) (app. supp. R4, tab 264).  There was no CO final decision (COFD) on the September 22, 2011 Purported Claim.

16.  On March 16, 2012, the Appellant submitted a certified claim to the government, indicating that there were delays to the 0085 Contract due to:  (1) the slow CCR procedure by the government and the GIRoA, including the GIRoA taking from August 6, 2011 to September 26, 2011 and from July 15, 2011 to the filing of the

---

[8] While Mr. Nassar provides a document that purports to be a Diplomatic Note for shipment 8, that document—particularly its date—is illegible (Nassar decl. I, ex. A).

claim to process tax exemption documents for shipments 12 and 13 respectively; (2) security and political issues; and (3) natural disasters and weather, including floods in Pakistan between mid-August and October 2011 (R4, tab 41). The March 16, 2012 Claim stated that the Appellant is seeking "178 days resulting from issues under section 1 [the CCR procedure] & 2 [security or political issues] above" (*id.* at 14). However, the March 16, 2012 Claim also included a table purporting to show the number of days of delay due to the CCR procedure (R4, tab 50). The March 16, 2012 Claim stated that "[i]t is important to notice that the Contractor is not requesting an extension of time for performance . . . , as this time has already been extended, but he is in fact requesting the payment of the additional overhead costs paid during these delays" (R4, tab 41 at 17). The March 16, 2012 Claim did not allege that the government mandated site-access for the Army and the ANA, the Appellant had to work around the Army and the ANA, the ANA damaged water lines, or the ANA took possession of nine trailers (*id.*).

17. On September 12, 2012, the CO issued a COFD denying the March 16, 2012 Claim in its entirety (R4, tab 2).

18. On December 11, 2012, the Appellant filed a notice of appeal with the Board, which we docketed as ASBCA No. 58451.

III.    The Government's Claim

19. The 0085 Contract, § 01015, ¶ 9.4.10 required that "'[g]rounding and bonding shall meet the requirements of NFPA 70 . . . . Insulated grounding conductor (separate from the electrical system neutral conductor) shall be installed in all feeders and branch circuit raceways.'" (R4, tab 10 at 137)

20. On November 15, 2010, the government conducted an inspection of the Appellant's electrical work on the project and prepared an electrical inspection report (app. R4 supp. tab 244). The report reproduced a picture purporting to show a missing ground conductor, but we are unable to determine whether that is accurate without expert testimony (*id.* at 2). The report also stated that:

> All feeders for the [Main Distribution Panel (MDP)] to the
> Distribution Panels (DP) are 4-wire systems. This does not
> allow for an equipment grounding conductor as required
> by (NEC 250.32(B)(1)) "For a grounded system at the
> separate building or structure, an equipment grounding
> conductor as described in 250.118 shall be run with the
> supply conductor and be connected to the building or
> structure disconnecting means and to the grounding
> electrode(s). The equipment grounding conductor shall be

8

used for grounding or bonding of equipment, structures, or frames required to be grounded or bonded. The equipment grounding conductor shall be sized in accordance with 250.122. Any installed grounded conductor shall not be connected to the equipment grounding conductor or to the grounding electrode(s)."

In addition there should be a grounding electrode system as required by (NEC 250.32(A)) "Building(s) or structure(s) supplied by feeder(s) or branch circuit(s) shall have a grounding electrode or grounding electrode system installed in accordance with Part III of Article 250. The grounding electrode conductor(s) shall be connected in accordance with 250.32(B) or (C). Where there is no existing grounding electrode, the grounding electrode(s) required in 250.50 shall be installed."

(*Id*. at 2-3) (emphasis omitted)

21. However, there is no evidence in the record regarding whether the Appellant installed a separate grounding for each building apart from the four-wire cables.

22. According to the government, the Appellant ceased work sometime after March 10, 2013, without completing the work (R4, tab 219 at 7). The government never issued a termination for default or an acceptance of the work performed (R4, tab 219 at 2).

23. On April 17, 2014, the CO sent the Appellant a demand for payment for purported electrical work deficiencies (R4, tab 234 at 4-6).

24. On May 5, 2014, the Appellant submitted a response to the CO's demand for payment, requesting a COFD regarding the demand (R4, tab 235 at 1).

25. On August 7, 2014, the Appellant filed a notice of appeal with the Board on the basis of a deemed denial, which we docketed as ASBCA No. 59465.

26. On November 19, 2014, the CO issued a COFD, asserting a government claim for electrical work deficiencies (R4, tab 219 at 1).

27. On November 21, 2014, the Appellant filed a notice of appeal with the Board, which we docketed as ASBCA No. 59701.

DECISION

As discussed in greater detail below, we deny the government's motion to dismiss on the grounds that the original named appellant was not the real party in interest, and grant the Appellant's cross-motion to amend the caption. Moreover, we deny the Appellant's claim because it is not entitled to an equitable adjustment for any constructive suspension of the 0085 Contract due to unreasonable government delay in issuing the CCRs and the Diplomatic Notes. Further, we do not possess jurisdiction over the Appellant's constructive suspension due to mandating that the Appellant provide site-access for the Army and the ANA claim, which in any event, the Appellant waived. Finally, we deny the government's claim for a contract reduction because it has failed to satisfy its burden of proof on that claim.

I.      The Appellant is the Real Party in Interest

We deny the government's motion to dismiss these appeals on the grounds that the original named appellant was not the real party in interest, and grant the Appellant's cross-motion to amend the caption. Under the Contract Disputes Act (CDA), we only possess jurisdiction to adjudicate appeals taken by a contractor. *Afghan Washington Constr. Co.*, ASBCA No. 60856, 18-1 BCA ¶ 37,009 at 180,242 (citing 41 U.S.C. § 7104). A contractor is a party to a government contract other than the government. *Id*. (citing 41 U.S.C. § 7101(7)); *see also* Board Rule 15(a). When the contractor is a separate legal entity from the named appellant, then the contractor— and not the appellant—is the real party in interest, even if the contractor is a fictitious business name for the appellant. *Latella, Inc.*, ASBCA No. 55653, 07-1 BCA ¶ 33, 521. However, if the fictitious business that is named in the contract has no legal existence apart from the real business, then the real business is the real party in interest. *Berlin d/b/a Spectro Sort and as Spectro Sort Mfg. Co.*, ASBCA No. 51919, 00-2 BCA ¶ 31,096. In considering whether two entities are separate legal entities, we may consider how the government treated the entities during performance. *See Green Dream Group*, ASBCA No. 57413, 12-2 BCA ¶ 35,145 at 172,519. Moreover, under Board Rule 6(d), we may permit either party to amend its pleading upon considerations fair to both parties.

Here, NGI Afghanistan for Contracting signed the 0085 Contract (finding 6). However, NGI Afghanistan for Contracting is not a separate legal entity from Nassar Group International N.G.I. S.A.L. (OffShore) R.C (finding 3). For example, there is no official documentation creating or recognizing NGI Afghanistan for Contracting as a separate legal entity, such as articles of incorporation (finding 3). Moreover, the government treated Nassar Group International N.G.I. S.A.L. (OffShore) R.C. and NGI Afghanistan for Contracting as the same entity during performance by making payments to Nassar Group International N.G.I. Offshore S.A.L. (finding ¶ 4).

10

The government points to the facts that Nassar Group International N.G.I. S.A.L. (OffShore) R.C. and NGI Afghanistan for Contracting have different CAGE and DUNS Codes (gov't reply at 9-10; gov't post-hrg. br. at 14-17).  However, it is not unusual for a single legal entity to have multiple Codes, *Tele-Consultants, Inc. v. United States*, 142 Fed. Cl. 686, 695-96 (2019), particularly for an entity such as the Appellant, which is a foreign company that had no experience with CAGE and DUNS Codes (finding 5).  The government also points to the Appellant's admission that NGI Afghanistan for Contracting was a wholly-owned subsidiary of Nassar Group International N.G.I. S.A.L. (OffShore) R.C. (gov't reply at 11).  However, whether NGI Afghanistan for Contracting was a wholly-owned subsidiary is not dispositive— what matters for purposes of determining who is the real party in interest is whether that wholly-owned subsidiary had a separate legal existence.  *DEI Indus., Inc.*, ASBCA No. 18342, 74-1 BCA ¶ 10,539; *see also Mega Enviro., Inc.*, ASBCA No. 51639, 99-1 BCA ¶ 30253.  As discussed above, NGI Afghanistan for Contracting did not have such a separate legal existence.  Finally, the government argues that some states require registration of fictitious names (gov't post hrg. reply at 14-15).  However, it does not even allege—let alone establish—that Afghanistan or Lebanon imposed such a requirement (*id.*).

Thus, the government's motion to dismiss is denied.  Moreover, because it most accurately reflects the true nature of the Appellant and the government has not identified any prejudice from an amendment to the caption, the fairest course of action is to amend the caption to reflect that the Appellant is Nassar Group International N.G.I. S.A.L. (OffShore) R.C., doing business as NGI Afghanistan for Contracting. *See Advanced Communications Sys.*, ASBCA No. 52592, 07-2 BCA ¶ 33,629 at 166,563.

II.     The Appellant is not Entitled to an Equitable Adjustment for a
        Constructive Suspension Due to any CCR Procedure Delays

The Appellant's claim that the government constructively suspended the 0085 Contract by unreasonably delaying the CCR procedure is barred by the sovereign acts doctrine.  In any event, the Appellant has failed to meet its burden of showing that the government took an unreasonable amount of time to perform the CCR procedure, or that any such delays delayed the 0085 Contract.[9]

---

[9] In its reply brief, the government argues for the first time that we do not possess jurisdiction over the CCR procedure claim because that claim was separate from the security or political issue claim, but did not state a separate sum certain (gov't reply at 19-20).  The government is correct that, when a case involves separate claims, the claims to the CO must state separate sums certain for each claim. *ECC Int'l Constr., LLC*, ASBCA No. 59586, 2021 WL 231891 (May 17, 2021) (citing *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000,

A. The CCR Procedure was a Sovereign Act

The CCR procedure—including the length of time that it took the government to issue the CCRs and the Diplomatic Notes—was a sovereign act, and thus cannot serve as the basis for a constructive acceleration claim. A sovereign act by the government cannot serve as the basis for a constructive acceleration claim. *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967).[10] A sovereign act is one that is "public and general" and not directed solely toward an appellant. *Id*.; *Conner Bros. Constr. Co., v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008). In determining whether an act is public and general, we consider if the act: (1) served a general purpose; (2) was specifically directed at nullifying contract rights or relieving the government of its contractual obligations; (3) applied exclusively to the contractor, or more broadly to other parties not in a contractual relationship with the government; and (4) provided an economic advantage to the government. *Conner Bros.*, 550 F.3d at 1372-75 (recognizing that raising taxes on a contractor's inputs, denying a contractor access to a city during wartime, and embargoing a shipment of goods are sovereign acts); *M.E.S., Inc.*, ASBCA No. 56149 *et al*, 12-1 BCA ¶ 34,958 at 171,856, *aff'd* 502 F. Appx. 934 (Fed. Cir. 2013) (holding that a change to base access requirements that delays a contractor constructing a facility on that base is a sovereign act); *Garco Const. Inc.*, ASBCA No. 57796, 15-1 BCA ¶ 36,135 at 176,378-79, *aff'd* 856 F.3d 938 (2017) (same).

Here, the CCR procedure—including the length of time that it took the government to issue the CCRs and the Diplomatic Notes—was a public and general act, and not directed specifically at the Appellant. First, the CCR procedure served a general purpose—namely to assure the GIRoA that the government was not abusing a tax exemption that the GIRoA had granted to the government for goods imported for the government's use (finding 10). The procedure for obtaining a tax exemption is part of the determination of taxation levels, which is a public and general act. *Conner*

1005-06 (Fed. Cir. 2015)). Moreover, the government is correct that the March 16, 2012 Claim stated that the Appellant is seeking "178 days resulting from issues under section 1 [CCR procedure] & 2 [security or political issues] above" (finding 16). However, the March 16, 2012 claim also included a table purporting to show the number of days of delay due to the CCR procedure (finding 16). From that table, the number of days and damages just for the purported CCR procedure delays are readily calculable. *ECC*, 2021 WL 231891. Thus, the government's argument is meritless.

[10] In denying the government's summary judgment motion, we held that there was a genuine issue of material fact as to whether the issuing of the Diplomatic Notes was a sovereign act. *Nassar Group Int'l*, ASBCA No. 58451, 19-1 BCA ¶ 37, 405 at 181, 832 - 33. As discussed above, we now find that the issuing of the Diplomatic Notes was a sovereign act.

*Bros.*, 550 F.3d at 1372-73. Moreover, just as establishing a procedure to allow people to enter a city during wartime or a military base is a public and general act, so too is establishing a procedure to allow goods to enter Afghanistan tax-free. *Id*.; *M.E.S.*, 12- 1 BCA ¶ 34,958 at 171,856; *Garco*, 15-1 BCA ¶ 36,135 at 176,378-79.

Second, the Appellant has pointed to no evidence—and there is none in the SOP adopting the CCR procedure—suggesting that the government adopted the CCR procedure specifically to nullify a right under the 0085 Contract or relieve the government of its contractual obligations (app. reply 30-32; finding 10). Nor has the Appellant pointed to any evidence that the length of time that it took the government to issue the CCRs and the Diplomatic Notes was unique to the Appellant, let alone that any such uniqueness was specifically directed at nullifying the Appellant's rights or the government's obligations under the 0085 Contract (app. reply 30-32). Indeed, the Appellant does not even identify a contract right or obligation that the CCR procedure allegedly nullified (*id*.). The 0085 Contract did not give the Appellant any right to—or impose any obligations upon the government regarding—tax-free importation of goods. On the contrary, the 0085 Contract expressly stated that the government "neither controls nor is responsible for any such customs clearance procedures, requirements, or changes thereto," and the 0085 Contract stated that "[i]t is the responsibility of the contractor to be knowledgeable of and to abide by any and all applicable customs clearance procedures and requirements that may be necessary for the transportation of supplies and equipment into Afghanistan" (finding 9).

Third, the CCR procedure applied to anyone importing goods into Afghanistan tax-free for government use, and not merely to the Appellant (finding 10). The Appellant argues that the CCR procedure was not public and general because it only applied to contractors (app. reply at 31). That argument fails legally and factually. Legally, we have recognized that the fact that an act only applies to contractors—as opposed to a particular contractor—does not negate it being a sovereign act, so long as the act's purpose is public and general. *M.E.S.*, 12-1 BCA ¶ 34,958 at 171,856; *Garco*, 15-1 BCA ¶ 36,135 at 176,378-79. Factually, the CCR procedure did not only apply to contractors; it applied to anyone seeking to import goods into Afghanistan tax-free for government use—including the military, other agencies, and DOD civilians (finding 10).

Finally, the Appellant has identified no economic advantage that the government gained by purportedly delaying the issuance of the CCRs and the Diplomatic Notes (app. reply 30-32). On the contrary, it was in the government's interest to complete the CCR procedure as quickly as possible so that the project could be completed as quickly as possible. Thus, the issuance of the CCRs and the Diplomatic Notes was a public and general act, so it was a sovereign act that cannot support a constructive suspension claim.

13

B. The Appellant has not Shown That the Government Unreasonably Delayed the CCR Procedure, or That That Delayed the 0085 Contract

In any event, the Appellant has failed to meet its burden, *see IDA Contracting Corp.*, ASBCA No. 36053, 88-3 BCA ¶ 21,167, of showing that the government unreasonably delayed the CCR procedure, or that any such delay delayed the 0085 Contract.

1. The Appellant has not Shown the Government Unreasonably Delayed the CCR Procedure

The Appellant has not shown that the government constructively suspended the 0085 Contract by unreasonably delaying the CCR procedure. Under FAR 52.242-14, a contractor is entitled to an equitable adjustment when the government constructively suspends work by delaying work for an unreasonable amount of time. *CATH-dr/Balti Joint Venture*, ASBCA No. 54239, 05-2 BCA ¶ 33,046 at 163,793 (citing *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359 (Fed. Cir. 2002)); *see also E.V. Lane Corp.*, ASBCA No. 9920, 65-2 BCA ¶ 5,076, at 23,884-88. However, a contractor is not entitled to an equitable adjustment for delays with other causes besides the government's conduct or inaction. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1348 (Fed. Cir. 2000); *E.V. Lane*, 65-2 BCA ¶ 5,076, at 23,892-95.

Here, for most shipments, the Appellant has not even demonstrated the amount of time it actually took the government to issue the CCR and the Diplomatic Note because it did not present evidence of the dates of: (1) the CCR requests for shipments 1-5, and 11-13; (2) the CCRs for shipments 3, 5, 7, and 13; or (3) the Diplomatic Notes for shipments 3, 5 - 8, and 13 (finding 14).

Even if the Appellant had shown how long it actually took the government to issue the CCRs and the Diplomatic Notes, the Appellant would not have shown that that amount of time was unreasonable because it has failed to establish what was a reasonable time for the government to issue the CCRs and the Diplomatic Notes. The Appellant asserts that 10 calendar days was a reasonable time for both the DOD to issue a CCR and the DOS to issue a Diplomatic Note because 10 calendar days purportedly exceeds the amount of time that the SOP said it could take for the MoFA or Customs to process the tax exemption documents (app. br. at 8). However, that analysis compares apples to oranges by deriving a conclusion about how long it reasonably should take two United States agencies—*i.e.*, the DOD *and* the DOS—to process tax exemption documents based upon how long the SOP said it could take for one GIRoA agency—*i.e.*, the MoFA *or* Customs (*id*.)—to process tax exemption

14

documents.[11]  Moreover, the Appellant has not established that the procedure for MoFA and Customs approval is analogous to—or reasonably should take the same amount of time as—the procedure for issuing CCRs and Diplomatic Notes (app. br. at 8).[12]  Further, the SOP merely indicates that it could take between 2 days and 10 days for the MoFA and should take between 5 days and 7 days for Customs to process tax exemption documents, but cautions that that time could be much longer, at least for Customs (finding 12).  And indeed, the Appellant recognizes that it often took the MoFA and Customs more than 10 days and 7 days respectively to process the tax exemption documents (R4, tab 50).  Therefore, the Appellant has failed to establish the reasonable amount of time that it should have taken for the government to issue the CCRs and the Diplomatic Notes, let alone that the length of time it actually took exceeded that reasonable time.

2. <u>The Appellant has not Shown That any Unreasonable Delay to the CCR Procedure Delayed the 0085 Contract</u>

Moreover, the Appellant has not shown that any delay to the CCR procedure delayed the 0085 Contract.  In order to recover for a claimed delay, the burden is on an appellant to establish that the government delay delayed the ultimate project completion, and that there was no concurrent delay.  *Law v. United States*, 195 Ct. Cl. 370, 384-86 (1971); *Safety Training Sys., Inc.*, ASBCA No. 57095, 14-1 BCA 35,509 at 174,055.  In construction cases, that usually is done through a critical path method (CPM) of schedule analysis.  *Nassar Group Int'l*, 19-1 BCA ¶ 37,405 at 181,833; *In re Galaxy Builders, Inc.*, ASBCA Nos. 50136, 50018, 00-2 BCA ¶ 31,040 at 153,282.  And indeed, the 0085 Contract required the use of CPM to prepare project schedules for use in evaluating time extensions (finding 7).[13]  Moreover, a contractor cannot recover for any concurrent delays, unless it proves that there is a clear apportionment between the delays.  *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984).  Further, a contractor cannot rely upon

---

[11] Further, the SOP does not specify whether it used calendar days or business days (finding 12), but the Appellant uses calendar days.

[12] On the contrary, the fact that an importer had to provide hard-copies of the Importer Documents after the COR issued the CCR but before the DOS issued the Diplomatic Note—while the importer submitted all the documentation to the MoFA before the clock starts running on the MoFA and Customs—suggests that it should have taken longer to obtain a Diplomatic Note than MoFA and Customs approval (finding 11).

[13] CPM sequences subprojects within an entire construction project based upon those subprojects' precedence and duration to determine the most efficient schedule for the completion of a project within a prescribed time.  *See Wilner v. United States*, 23 Cl. Ct. 241, 244-45 (1991); *Galaxy Builders*, 00-2 BCA ¶ 31,040 at 153,282.

15

generalized testimony. *Peter Bauwens Bauunternehmung GmbH & Co. KS*, ASBCA No. 44679, 98-1 BCA ¶ 29,551 at 146,499.

Here, the Appellant concedes that it "is very difficult to determine" what activities are on the critical path (app. br. at 18). Nevertheless, the Appellant relies upon a declaration from Gaby Bou Gharios—an Appellant technical manager—asserting that he performed an "Impacted As Planned" Time Impact Analysis (TIA) that made unspecified adjustments to an unidentified schedule (Gharios decl. (app. br. ex. B) ¶ 19). That declaration is too general to establish delay for several reasons. First, the Gharios Declaration does not identify the schedule Mr. Gharios used (*id.*). While the 0085 Contract required CPM project schedules (finding 7), and the Appellant concedes that "any sort of reliable Time Impact Analysis (TIA) is nearly impossible" absent an approved schedule (app. reply 16), there is no evidence that Mr. Gharios used an approved CPM project schedule (Gharios Decl. (app. br. ex. B) ¶ 19).

Second, the Gharios Declaration does not even specify what adjustments Mr. Gharios made to the schedule, let alone provide any evidence of the purported TIA.[14] The Appellant concedes that "to properly assess the impacts . . . a time impact analysis TIA would inject the delays as fragnets against a baseline schedule" in order to "introduce the logical links between the fragnet" and "assess the impacts to the chain of activities from those delays" (app. reply at 15, 21); *see also Hedgecock Elec., Inc.*, ASBCA No. 56307, 12-2 BCA ¶ 35,086 at 172,305.[15] Here, the Gharios Declaration does not inject fragnets against the baseline project schedule to introduce the logical links between the fragnet and assess the impacts to the chain of activities from those delays (Gharios Decl. (app. br. ex. B) ¶ 19).

Third, the Gharios Declaration is insufficient to establish delay to the overall project because it fails to consider the impact of other delays. The Appellant concedes—as it must—that "a proper TIA would have assessed the project schedule from the [notice to proceed] to completion, and considered all delays and their impacts to the project activities" (app. reply at 17); *States Roofing Corp.*, ASBCA No. 54,860, 10-1 BCA ¶ 34,356 at 169,662. Moreover, the Appellant admits in its brief and claim

---

[14] To the extent the Gharios Declaration is referring to the GANT chart attached to Mr. Nassar's declaration as his TIA, that is not a TIA because it does not provide a baseline schedule, add fragnets, show the impact of purported government delay on the project's logic, or take account of other delays. Rather, it merely shows the length of each purported government delay. (App. br. ex. A at 40)

[15] A fragnet is a sequence of new activities and/or activity revisions, logical relationships, and resource changes added to an existing schedule to demonstrate the influence of a new activity on the schedule. *Hedgecock*, 712-2 BCA ¶ 35,086 at 172,305.

16

that there were numerous other delays impacting the project during the purported CCR procedure delays, such as the delays due to: (1) security and political issues, including the Death of Osama bin Laden in April 2011, the assassination of a former GIRoA president in September 2011, and an attack on the United States Embassy in September 2011; (2) natural disasters and weather, including flooding in Pakistan between August 2011 and October 2011; and (3) the GIRoA's delay in processing tax exemption documents (finding 16; app. reply at 25). However, the Gharios Declaration admits that "none of NGI's analyses take into account other actual delays that are due to no fault of NGI" (Gharios decl. (app. br. ex. B) ¶ 16). That failure to consider other delays renders the Gharios Declaration insufficient to establish delay. *States Roofing*, 10-1 BCA ¶ 34,356 at 169,662.

The Appellant argues that it is entitled to an extension of time, even if the purported government delay was concurrent with excusable delay (*i.e.*, delay for which the Appellant is not responsible) (app. reply at 28-30). However, the Appellant is not seeking an extension of time; but compensable delay (finding 16). A contractor "has the burden of proving that the claimed compensable delay was solely due to government-responsible causes [and] was not concurrent with contractor-responsible or excusable delay. . . ." *Carothers Const., Inc.*, ASBCA No. 48042, 00-1 BCA ¶ 30,637 at 151,268. That is because, if government delay was concurrent with excusable delay, the contractor would have been delayed anyway, so the government delay did not cause compensable delay to the overall project. *Merritt-Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 1397 (Ct. Cl. 1976). Therefore, the fact that the purported government delay was concurrent with excusable delay means that the Appellant is not entitled to compensation for the purported government delay absent apportionment, which the Appellant does not even attempt to establish.

The Appellant also argues that issuance of the CCRs and the Diplomatic Notes must have been on the critical path because the project was 99% complete as of July 11, 2012, but the pre-engineered buildings (PEBs) and other materials in shipments 12 and 13 still had not been delivered as of that date (app. br. at 18-19, 22-23). As an initial matter, the Appellant's argument focuses upon shipments 12 and 13, without addressing delays to shipments 1 through 11 (Gharios decl. (app. br. ex. B) ¶ 11). Even as to shipments 12 and 13, the purported delay in issuing the CCRs and the Diplomatic Notes was complete by November 15, 2011 (finding 14). Without any TIA analysis, the Appellant fails to establish how those purported delays still were impacting the schedule eight months later on July 11, 2012 (app. br. at 18-19, 22-23; Gharios decl. (app. br. ex. B) ¶¶ 4, 11-29). Moreover, as discussed above, that argument ignores concurrent delay.

In sum, the Appellant has failed to meet its burden of showing that any CCR procedure delay caused a delay to the 0085 Contract.

17

III.    The Appellant is not Entitled to an Equitable Adjustment for any Delay Due to the Government Mandating Site-Access for the Army and the ANA

We do not possess jurisdiction over the Appellant's claim that the government delayed the project by mandating site-access for the Army and the ANA, and, in any event, the Appellant waived that claim.

A.    We do not Possess Jurisdiction Over the Site-Access Claim

We do not possess jurisdiction over the Appellant's claim that the government delayed the project by mandating site-access for the Army and the ANA.  We do not possess jurisdiction to entertain a claim unless a contractor presented that claim to the CO.  *Nassar*, 19-1 BCA ¶ 37,405 at 181,831.  "While an appellant may introduce on appeal additional facts that do not alter the nature of the original claim, its appeal must be based upon a common or related set of operative facts to those presented to the CO."  *Id*. (citing *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003); *Trepte Constr. Co.,*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86).  A claim is new if it "presents materially different factual or legal theories of relief."  *Nassar*, 19- 1 ¶ BCA 37,405 at 181,831 (citing *Lee's Ford Dock, Inc. v. Secretary of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017)).  "Materially different claims will necessitate a focus on a different or unrelated set of operative facts."  *Id*. (quoting *Lee's Ford*, 865 F.3d at 1369).

Here, the site-access claim that the Appellant raises in these appeals is a new claim because it is materially different than the claim it presented to the CO.  The Appellant's Rule 11 brief argues in the introduction that:

> The Government also mandated site-access for US Army personnel and the Afghan National Army (ANA).  By doing so, NGI had to work around the activities of those third parties, repeatedly restructuring its planned work activities and labor/personnel necessary for project execution.  Additionally, the access by those third parties increased NGI's costs on the site as the ANA damaged water lines and other items NGI already installed on the project, requiring NGI to redo activities.  The ANA also wrongfully took possession of 9 trailers of NGI's supplies and materials and refused to return them to NGI.  NGI regularly and routinely appraised the Government of the delays to the project, including for those issues raised above.  Additionally, NGI regularly and routinely provided

18

the Government notice of other delays, outside the control
of NGI and without the fault or negligence of NGI.

(App. br. at 1-2)  That argument necessitates a focus on a different and unrelated set of operative facts than that raised in the March 16, 2012 Claim because the March 16, 2012 Claim did not assert that the government mandated site-access for the Army and the ANA, the Appellant had to work around the activities of the Army and the ANA, the ANA damaged water lines, or the ANA took possession of nine trailers (finding 16). Indeed, the Appellant does not even dispute that these appeals' site-access claim necessitates a focus on a different and unrelated set of operative facts than those asserted in the March 16, 2012 claim (app. reply at 10-12).

Instead, the Appellant argues that these appeals' site-access claim is based upon a common or related set of operative facts to those asserted in the September 22, 2011 Purported Claim (*id*.).  Assuming without deciding that the September 22, 2011 Purported Claim constituted a valid claim, that argument would lack merit.  The September 22, 2011 Purported Claim made allegations about an entirely different third party—the ANP—than the third-parties address in these appeals—namely the Army and the ANA.  (*Compare* finding 15 *with* app. br. at 1).  Moreover, the September 22, 2011 Purported Claim make allegations about entirely different incidents—namely the purported ANP attempt to extort money from Mr. Nassar—than the incident alleged in these appeals—namely the Appellant's purported working around the Army and the ANA, the ANA's purported damaging of water lines, and the ANA's purported taking possession of nine trailers (app. br. at 1-2).  Because the Appellant's arguments in these appeals necessitate a focus on a different and unrelated set of operative facts than those presented in a claim to the CO, they are a new claim over which we do not possess jurisdiction. *Nassar*, 19-1 BCA ¶ 37,405 at 181,831.

B.  The Appellant Waived the Site-Access Claim

In any event, the Appellant waived its claim that the government delayed the project by mandating site-access for the Army and the ANA.  The Board will not make a party's case for it. *Lebolo-Watts Contractors 01 JV, LLC*, ASBCA No. 59740, 2020 WL 9396047 (Nov. 17, 2020); *McCotter Motors, Inc.*, ASBCA Nos. 30498, 30997, 86-2 BCA ¶ 18,784 at 94,647; *see also Dunkel v. United States*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs").  Nor is the Board required to scour the record for an appellant. *Parsons Evergreene, LLC v. Sec'y of Air Force*, 968 F.3d 1359, 1368 (Fed. Cir. 2020); *ESCgov, Inc.*, ASBCA No. 58852, 17-1 BCA ¶ 36,772 at 179,189; *Highland al Hujaz Co.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,169-70; *Gary Aircraft Corp.*, ASBCA No. 21731, 91-3 BCA ¶ 24,122 at 120,718 ("[w]e are not charged with sorting through a haystack of documents to locate relevant facts.").  Therefore, "[i]t is well established that arguments that are not

appropriately developed in a party's briefing may be deemed waived." *United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013).

Here, the Appellant cites no evidence in support of its claim that the government delayed the project by mandating site-access for the Army and the ANA (app. br. at 1-2). Indeed, apart from the conclusory paragraph in its introduction quoted above, the Appellant's brief does not even present argument regarding that claim (*id.*). Therefore, the Appellant waived its argument that the government delayed the project by mandating site-access for the Army and the ANA.

Instead of correcting those deficiencies in its reply brief, the Appellant instead shifts back to its claim regarding the ANP extorting money from Mr. Nassar, stating that "[a]ppellant has shown all of the requisite factors within [the September 22, 2011 Purported Claim] to entitle it to an extension of time . . . ." (App. reply at 12). As an initial matter, the Appellant waived any arguments about the ANP extorting money from Mr. Nassar by failing to raise them in its opening brief. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); (app. br. at 1-2). In any event, those arguments suffer from the same defects as the Appellant's argument regarding mandating site-access for the Army and the ANA—namely that the Appellant fails to provide any citations to the record, and leaves it to the Board to make the argument for it (app. reply at 12). Therefore, the Appellant also waived its argument that mandating site-access for the ANP delayed the project.

IV.     The Government has Failed to Establish its Claim

The government has failed to establish its claim that the Appellant purportedly failed to install insulated grounding conductors separate from the electrical system neutral conductor in all feeder and branch circuit raceways (gov't br. at 35-37). While there is a contemporaneous report complaining about the Appellant using a four wire system (finding 20), the Appellant argues that, in addition to that four wire system, it installed a separate ground for each building, which complied with the requirement for grounding conductors separate from the electrical system neutral conductor (app. reply at 32-35).[16] The government responds that the Appellant does not cite any documents in the record to support that argument (gov't reply at 33). That is true, but ignores the fact that the government also fails to present any evidence regarding whether there was a separate ground for each building—apart from the four-wire cables—that complied with the contract requirements (*id.*; finding 21). Since it is the government's burden to

---

[16] While the Appellant did not raise the above argument in its opening brief, the Appellant did not waive that argument because it made that argument in response to a government claim. Moreover, the government suffered no prejudice because it had the opportunity to respond to the argument in its reply brief.

20

prove its claim, *Santa Barbara Research Ctr.*, ASBCA No. 27831, 88-3 BCA ¶ 21,098 at 106,516, the complete lack of evidence as to whether there was a separate ground (finding 21) compels us to deny the government's claim.

CONCLUSION

For the foregoing reasons, we deny the government's motion to dismiss, and grant the Appellant's cross-motion to amend the caption. We deny both the government's claim and the Appellant's claim.

Dated: September 29, 2022

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58451, 59465, 59701, Appeal of Nassar Group International, rendered in conformance with the Board's Charter.

Dated: September 30, 2022

PAULLA R. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals